Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Casey E. Sadler (#274241)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495
Email: lglancy@glancylaw.com

*Attorneys for Lead Plaintiff NDM Investor Group and the Proposed Plaintiff Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VICTOR DIAZ, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN DYNASTY MINERALS LTD., RONALD W. THIESSEN, and MARCHAND SNYMAN,<br><br>Defendants. | Case No: 2:17-cv-01241-PSG-SS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 7

III. PARTIES ........ 8

A. Lead Plaintiffs ........ 8

B. Defendants ........ 8

C. Relevant Non-Parties ........ 10

IV. STATEMENT OF FACTS ........ 11

A. Overview of Northern Dynasty and the Fraught History of the Pebble Project ........ 11

B. Anglo American Abandons the Pebble Project ........ 16

C. Kerrisdale Capital Releases Report Undermining Northern Dynasty's False Narrative ........ 18

V. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSEAND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD ........ 26

A. Defendants' False and Misleading Statements Disseminated to the Public on September 16, 2013 ........ 26

B. Defendants' False and Misleading Statements Disseminated to the Public on September 23, 2013 ........ 29

C. Defendants' False and Misleading Statements Disseminated to the Public on December 13, 2013 ........ 30

D. Defendants' False and Misleading Statements Disseminated to the Public on March 27, 2014 ........ 31

E. Defendants' False and Misleading Statements Disseminated to the Public on May 15, 2015 ..... 33

F. Defendants' False and Misleading Statements Disseminated to the Public on May 2, 2016 ..... 34

VI. DISCLOSURES AT THE END OF THE CLASS PERIOD ..... 36

VII. MATERIALITY ..... 37

VIII. LOSS CAUSATION ..... 42

IX. ADDITIONAL SCIENTER ALLEGATIONS ..... 45

A. The Development of the Pebble Project Was the Company's Only Undertaking ..... 46

B. Defendant Thiessen Was a Substantial Shareholder of the Company ..... 48

C. Northern Dynasty Was a Small Company ..... 48

D. Northern Dynasty Executives Were Aware of Competing Estimates But Focused Investors on Outdated 2011 Assessment ..... 49

X. CLASS ACTION ALLEGATIONS ..... 51

XI. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ..... 53

XII. NO SAFE HARBOR ..... 55

XIII. COUNTS ..... 56

XIV. PRAYER FOR RELIEF ..... 61

XV. JURY TRIAL DEMANDED ..... 62

Court-appointed Co-Lead Plaintiffs Stephania Nizolek and Cristos Thanos (collectively, "Lead Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Northern Dynasty Minerals Ltd. ("Northern Dynasty" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Northern Dynasty; and (c) review of other publicly available information concerning Northern Dynasty. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action against Northern Dynasty and certain of its officers and directors for violations of the federal securities laws. Lead Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of themselves and all similarly situated purchasers of Northern Dynasty securities between September 16, 2013 and February 13, 2017, inclusive (the "Class Period"). Lead Plaintiffs allege that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Northern

Dynasty's stock price by misrepresenting material facts concerning its principle asset, the Pebble Project, a mineral mining project in Alaska.

2. The Pebble Project has been criticized by environmentalists, regulators, and local politicians for its potential negative impact that development would have on the environment. This securities fraud class action, however, does not hinge on whether the Pebble Project should be granted regulatory approval or if the proposed development would impact the environment adversely. Plaintiffs' allegations stem from material omissions and misleading statements during the Class Period concerning the costs associated with developing and operating the Pebble Project and the Pebble Project's overall feasibility, as summarized below and described more fully herein.

3. Northern Dynasty is a publicly-traded Canadian mineral exploration company headquartered in Vancouver, British Columbia. Northern Dynasty is primarily focused on developing the Pebble Project, a copper-gold-molybdenum-silver mineral project. The Pebble Project is located in southwest Alaska, approximately 200 miles (320 kilometers) southwest of the city of Anchorage. The Company has repeatedly described the Pebble Project as a "world class investment opportunity" insofar as it purportedly contains one of the largest undeveloped sources of copper and gold ore. Over $750 million has been committed to developing the Pebble Project; however, the Pebble Project has not been commercially developed to date.

4. Despite being publicly traded, Northern Dynasty remains a small operation managed by a small cadre of key executives including defendants Ronald W. Thiessen ("Thiessen"), the Company's Chief Executive Officer ("CEO"), and Marchand Snyman ("Snyman"), the Company's Chief Financial Officer ("CFO") (collectively, with Northern Dynasty, the "Defendants"). In fact, as of December 31, 2014, Northern Dynasty had only 12 full time employees. The Company historically relied upon seconded employees of a subsidiary of non-party Hunter Dickinson Inc. (defined herein as "HDI"), with which Northern Dynasty shares overlapping executives, to provide geological, corporate development, administrative and management services.

5. In addition, Northern Dynasty historically relied upon its development partners to provide financing and technical services in connection with its pursuit of the Pebble Project. Anglo American plc ("Anglo American") was Northern Dynasty's 50% co-developer of the Pebble Project. In fact, Anglo American committed over $500 million to developing the Pebble Project and worked alongside Northern Dynasty executives to assess the feasibility of the Pebble Project. Anglo American, however, abandoned the Pebble Project in late 2011 and took an approximate $300 million write-down on its ownership stake. At that time, Northern Dynasty attributed Anglo American's internal decision to walk away from the Pebble Project to a decision focus on other development priorities as opposed to a negative reflection on the Pebble Project.

6. Following Anglo American's departure and throughout the Class Period, Northern Dynasty touted the Pebble Project as a phenomenal lucrative opportunity. At no time did they reveal that they had seen numerous studies that presented a very different picture. During the Class Period, Defendants told investors that the expected capital cost of the Pebble Project would be slightly less than $4.7 billion. At no time did Defendants reveal in Northern Dynasty's Class Period SEC filings or press releases the existence of other reports and assessments projecting costs that were more than double the figure that Defendants were telling the public.

7. Following the recent election of President Donald J. Trump, Defendants seized on the narrative that Northern Dynasty's regulatory woes, which were constant under the Obama administration's EPA, would fade away under the incoming Trump's administration EPA. Investors came to be believe that after years of false starts the Pebble Project would soon become a commercially viable enterprise. Defendants did not tamp down, and in fact encouraged, such enthusiasm despite their private awareness of the costs and risks associated with developing the Pebble Project. The enthusiasm was short-lived.

8. On February 14, 2017, Kerrisdale Capital Management LLC ("Kerrisdale Capital"), a hedge fund management company, announced a short position in Northern Dynasty and published a research report that justified its investment thesis. As described herein, Kerrisdale Capital, based on discussions

with former Pebble Project insiders, including engineers who worked on developing project cost estimates, and reported that Northern Dynasty, was aware of cost projections that were materially higher than those previously disclosed to investors. The Company allegedly sought to prevent these analyses from being publicized. In addition, Kerrisdale Capital concluded that Anglo American walked away from its more than $500 million investment in the Pebble Project after recognizing the economics did not make sense.

9. Anglo American personnel viewed Northern Dynasty's economic analyses as unrealistic and overly optimistic, even speculating that concern for the company's stock price was pushing Northern Dynasty management to make short-sighted choices. In Anglo's more sober view, Pebble's upfront capital costs would be more than 100% higher than what Northern Dynasty has suggested, while operating costs would be roughly 20% higher. In addition, Kerrisdale Capital reported that despite years of trying, Northern Dynasty affiliated engineers *could not* find scenarios that yielded a net positive value – even if significant regulatory hurdles were not factored into those analyses.

10. Accordingly, Lead Plaintiffs assert that Defendants omitted to disclose material information and made materially misleading statements concerning the Pebble Project to investors during the Class Period. Namely, Defendants did not disclose that Anglo American, its Pebble Project development partner walked away from its more than $500 million investment, and took a $300 million write-down,

after recognizing that the costs of developing and operating the mine would be materially higher than previously disclosed. In addition, Defendants made materially misleading statements to investors during the Class Period insofar as Defendants did not accurately portray the costs or risks attendant to developing the Pebble Project. Defendants instead repeatedly chose to rely upon previously disclosed information concerning development and operating costs despite their awareness of more accurate estimates. As a direct consequence of Defendants non-disclosures and materially misleading disclosures, the price of Northern Dynasty securities were artificially inflated during the Class Period.

11. Once the truth concerning the costs of developing the Pebble Project was disclosed following the release of the Kerrisdale Report, investor confidence in Northern Dynasty was shattered and an immediate decline in the price of Northern Dynasty shares ensued. On October 21, 2016, the first day of trading following these disclosures, Northern Dynasty shares fell $0.68 per share, or over 21%, from $3.18 to close at $2.50 per share on extremely high trading volume of more than 65 million shares (compared to average trading volume of approximately 670,000 shares per day during the Class Period). In the days that followed, Northern Dynasty stock continued to decline, sinking to $2.26 by February 17, 2017 to close the week as investors digested the full impact of Defendants' material omissions, misleading statements and deliberately reckless acts.

12. As set forth herein, Defendants omitted to disclose material facts and/or presented materially misleading information to investors concerning Northern Dynasty's development of the Pebble Project. These omissions and misrepresentations were highly material to investors and analysts, as evidenced by the significant decline in the price of Northern Dynasty's shares once the truth was revealed. Investors were severely injured by the fraud, and Lead Plaintiffs seek damages on behalf of the entire Class.

13. Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's stock. Lead Plaintiffs and other Class members have suffered significant losses and damages at the hands of defendants and are entitled to redress.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in

furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

18. Co-Lead Plaintiff Stephania Nizolek purchased Northern Dynasty common stock during the Class Period, as was detailed in a sworn certification filed previously with the Court, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Co-Lead Plaintiff Cristos Thanos purchased Northern Dynasty common stock during the Class Period, as was detailed in a sworn certification filed previously with the Court, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

20. **Defendant Northern Dynasty, Ltd.** (previously defined as "Northern Dynasty" or the "Company") engages in the exploration and development of

mineral properties in the United States. Northern Dynasty's principal property is the Pebble copper gold-molybdenum mineral project located in southwest Alaska (the "Pebble Project"). The Company is incorporated in British Columbia, Canada and its principal executive offices are located at 15th Floor, 1040 West Georgia Street Vancouver, British Columbia, Canada, V6E 4H1 A. Northern Dynasty securities are traded on NYSE American ("NYSE American") under the ticker symbol "NAK."

21. **Defendant Ronald W. Thiessen ("Thiessen")** has been the Chief Executive Officer ("CEO"), President and a director of the Company throughout the Class Period. Since 1986, Mr. Thiessen has been involved in the acquisition and financing of mining and mineral exploration companies.

22. **Defendant Marchand Snyman ("Snyman")** has been the Chief Financial Officer ("CFO") of the Company throughout the Class Period. Additionally, Snyman was a director of the Company throughout the Class Period until February 24, 2016

23. Hereinafter, Defendants Thiessen and Snyman will be collectively referred to as the "Individual Defendants." Defendant Northern Dynasty and the Individual Defendants will be collectively referred to as "Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Northern Dynasty's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio

managers, and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

### C. <u>Relevant Non-Parties</u>

24. **Non-Party Hunter Dickinson Inc. ("HDI")** is a privately-owned, Vancouver, Canada-based, diversified, global mining group. HDI provides management and technical services to a diverse portfolio of high-quality and high-growth mineral companies and properties, including Northern Dynasty. Defendant Thiessen serves as HDI's CEO and Director. Together with Chairman of HDI and Northern Dynasty Director, Robert A. Dickinson ("Dickinson"), Thiessen serves on the boards of directors of other publicly traded companies associated with HDI. In addition, several other Northern Dynasty executives hold positions at HDI,

including Defendant Snyman, who serves as HDI's Chief Operating Officer ("COO").

25. **Non-Party Hunter Dickinson Services Inc. ("HDSI")**, a subsidiary of HDI, geological, corporate development, administrative and management services to, and incurs third party costs on behalf of, Northern Dynasty at costs negotiated by Northern Dynasty's Board of Directors.

26. **Non-Party Pebble Limited Partnership ("Pebble Partnership")** is the entity through which Northern Dynasty manages its 100% ownership interest in the development of the Pebble Project. At least certain of the Pebble Partnership employees, including the CEO Thomas Collier, are compensated directly through a subsidiary of Northern Dynasty.

## IV. STATEMENT OF FACTS

### A. Overview of Northern Dynasty and the Fraught History of the Pebble Project

27. Northern Dynasty is a mineral exploration company, incorporated in Canada and Vancouver, British Columbia, Canada. Northern Dynasty is a publicly traded company. The Company's shares trade on the NYSE American Exchange (f/k/a "NYSE MKT") and the Toronto Stock Exchange ("TSX").

28. Historically, Northern Dynasty did not generate any operate revenue. In addition, the Company historically relied upon seconded employees of a subsidiary of non-party HDI, with which Northern Dynasty shares overlapping

executives, to provide geological, corporate development, administrative and management services.

29. Northern Dynasty has focused exclusively on developing the Pebble Project, a copper-gold-molybdenum-silver mineral project. As depicted by the following chart, the Pebble Project is located in southwest Alaska, approximately 200 miles (320 kilometers) southwest of the city of Anchorage.




30. The Company's Alaska mineral resource exploration business is operated through an Alaskan registered limited partnership, the Pebble Limited Partnership (the "Pebble Partnership" or "PLP"), in which the Company (since December 2013) owns a 100% interest through subsidiary entities. A brief history

of the Pebble Partnership, adopted from the Company's Form 20F for the year ending December 31, 2015, follows. On July 26, 2007, the Company converted a wholly-owned general partnership that held its Pebble Project interests into a limited partnership, the Pebble Partnership, which would be responsible for permitting and developing the mining operations. Anglo American through a wholly-owned affiliate subscribed for 50% of the Pebble Partnership's equity effective July 31, 2007. To maintain its 50% interest in the Pebble Partnership, Anglo American was required to commit staged cash investments into the Pebble Partnership aggregating to $1.5 billion. As described herein, *see* Section IV.B, *infra*, on September 15, 2013, Anglo American gave notice to the Company of its withdrawal from the Pebble Partnership. In December 2013, Northern Dynasty exercised its right to acquire Anglo American's 50% interest and consequently holds a 100% interest in the Pebble Partnership.

31. Over the course of the Pebble Project's development, Northern Dynasty never publicly deviated from its lofty valuation of the project's potential. For example, in a May 2016 corporate presentation, Northern Dynasty called the Pebble Project as world class investment opportunity and ranked it "among the world's greatest stores of mineral [w]ealth."

32. Moreover, it is undisputed that the scale of the Pebble Project is vast. For example, preliminary designs of the Pebble Project, filed by Northern Dynasty with the SEC, called for "an open pit mine that could become two to three miles

wide and a mile deep," which "would be one of the largest open-pit mines in the world" and accompanied by "a tailings dam will rise 700 feet high, covering several square miles and able to hold billions of tons of mining waste."[1]

33. Yet, valuable copper and gold ores, if they cannot be extracted in cost-effective manner, are worth no more than gangue. Developing and operating a mine on the scale as vast as the Pebble Project is expensive, even assuming *arguendo* that all federal and state-level regulatory approvals are secured.[2]

34. Recognizing that the Company could not shoulder the development costs alone, Northern Dynasty consistently relied upon the expertise and financial

---

[1] *See* Transcript, Frontline Documentary: Alaska's Gold, PBS.org, dated July 24, 2012, *available at*: http://www.pbs.org/wgbh/frontline/film/alaska-gold/transcript/.

[2] In addition to the Company's well-publicized difficulties with receiving signoff from the U.S. Environmental Protection Agency (the "EPA"), Northern Dynasty will ultimately need to address persistent local opposition to the mine. *See* T. Sohn, "Alaska's Pebble Mine and the Legend of Trump's Gold," *New Yorker*, dated Mar. 2, 2017, *available at*: https://www.newyorker.com/tech/elements/alaskas-pebble-mine-and-the-legend-of-trumps-gold (Tim Bristol, the executive director of the Alaskan conservation group SalmonState, "Pebble does not have an E.P.A. problem. They have an Alaska problem. It's the development project that Alaskans love to hate."); E. Brehmer, "Walker against Pebble and EPA, suggests 5% agency cuts", Alaska Journal of Commerce, dated Oct. 15, 2014, *available at*: http://www.alaskajournal.com/business-and-finance/2014-10-15/walker-against-pebble-and-epa-suggests-5-agency-cuts#.WbIXnVGGOUm (Alaska Governor Bill Walker remarked, "Based on what I know at this point I'm not in favor of Pebble," while still a political candidate); Obituary, "Remembering Stevens: senator was as a straight-shooter on seafood," *Alaska Journal of Commerce*, dated Aug. 19, 2010, *available at*: http://www.alaskajournal.com/community/2010-08-20/remembering-stevens-senator-was-straight-shooter-seafood#.WbIXhVGGOUl (Former Sen. Ted Stevens: "I am not opposed to mining, but it is the wrong mine for the wrong place.").

support of development partners and corporate investors. For example, multinational corporations such as Mitsubishi Corporation[3] and the mining conglomerate Rio Tinto plc owned significant stakes in Northern Dynasty at various times. More directly, Northern Dynasty, and its executives, worked closely with Anglo American, its 50% joint venture partner since 2007, to develop the Pebble Project. Anglo American committed over $500 million to developing the Pebble Project, as discussed herein.

35. On February 23, 2011, the Company announced the results of the Pebble Project's Preliminary Assessment Report. That report estimated development costs to be $4.7 billion.[4] Even using those assumptions, Northern Dynasty recognized that it *did not* have the financial capability of developing the Pebble Project into a commercial venture due to expected costs. The Company decided to openly market itself as an acquisition target.

36. In a March 10, 2011 article titled the "$6 Billion Pebble: Northern Dynasty Expects a Takeover of its 50% of the World's Largest Undeveloped Deposit", Defendant Thiessen stated: "It's unlikely that Northern Dynasty as a separate entity will be there for the development and construction of this project.

---

[3] Mitsubishi Corporation acquired a 9.1% stake in Northern Dynasty in February 2008 before selling off its shares prior to the Class Period in March 2011.

[4] Northern Dynasty Press Release, "Northern Dynasty Receives Positive Preliminary Assessment Technical Report for Globally Significant Pebble Copper-Gold-Molybdenum Project in Southwest Alaska," dated Feb. 23, 2011, *available at*: http://www.northerndynastyminerals.com/ndm/NewsReleases.asp?ReportID=595724.

Pebble's structure has been built around the end result that we would likely be acquired."[5] Robert Dickinson, then Executive Chairman of Northern Dynasty, anticipated receiving "competitive interest in Pebble from a broad range of potential acquirers."[6] Yet, by August 2011, the Company conceded that it had not received a single takeover offer.[7]

**B. Anglo American Abandons the Pebble Project**

37. On September 16, 2013, Anglo American announced its decision to walk away from the Pebble Project after investing more than $541 million in development costs. In December 2013, Anglo American also announced that it would take a $300 million write-down on its stake in the Pebble Project.[8]

38. Northern Dynasty sought to spin Anglo American's departure as a net benefit. During a quickly assembled September 16, 2016 investor call, Thiessen explained:

---

[5] *See* K. Grace, "$6 Billion Pebble: Northern Dynasty Expects a Takeover of its 50% of the World's Largest Undeveloped Deposit", ResourceClips.com, dated Mar. 10, 2011, *available at*: http://resourceclips.com/wp-content/remote/pub_pdf/the_6_billion_NDM_CA.pdf

[6] A. Jensen, "Northern Dynasty looks to sell Pebble stake," Homer News, dated Apr. 27, 2011, *available at*: http://homernews.com/stories/042711/business_nddl.shtml.

[7] *See* M. Pemberton, "Northern Dynasty puts stake in Pebble prospect up for sale," Alaska Dispatch News, dated Aug. 30, 2011, *available at*: https://www.adn.com/economy/article/northern-dynasty-puts-stake-pebble-prospect-sale/2011/08/30/.

[8] A. Kommenic "Northern Dynasty share price rises 12% as company officially reclaims 100% of Pebble project", Mining.com, dated Dec. 13, 2013, *available at*: http://www.mining.com/with-anglo-officially-out-northern-dynasty-alone-in-pebble-project-49690/.

> From NDM standpoint, this means that we will now be back in possession of 100% of the Pebble projects, and the beneficiary of something north of $540 million worth of expenditures by Anglo over the last five years, a tremendous database and one which provides us with the opportunity to completely evaluate this project, and we're in a position where we are 99% complete on I would say the project description, which is the functional document for permitting purposes.
>
> The decision that Anglo made certainly was not known to us prior to Friday, although we were aware as everybody was that a project review was underway about mid-summer, and I think I know that from NDM standpoint, we were the first one to receive a call, even the Pebble people in Alaska were not aware of it until I made a subsequent call to them on Friday evening to the CEO of the Pebble Partnership.

39. As described herein (*see* Section IV.C, *infra*), Defendants were acutely aware of Anglo American's concerns regarding the economic feasibility of the Pebble Project, but such concerns were not disclosed to investors until the publication of the Kerrisdale Capital report in February 2017.

40. During the same September 16, 2013 call, Thiessen went on to explain that Northern Dynasty's permitting process would not be impacted by Anglo American's departure, though the Company would be forced to impose austerity measures.

> I know that the heavy lifting has been done and so the costs involved of going permitting will drop substantially. There is probably a even a difference in the cost of permitting whether it's done under an Anglo regime or a Northern Dynasty regime and certainly we'll be looking at that I mean, effectively we're going to step forward to a zero based budged on this project for the year 2014 as if we're carrying a permitting through. And then once we've got that hand, once we've dealt with Anglo's withdrawal, we will look at what is the most optimum way of moving this project ahead, but I mean, certainly we don't need a $1 billion to get this thing through project permitting

> which is roughly the amount that was left in the Anglo expenditure to retain their 50% interest.

41. In subsequent weeks, the Pebble Project let go of over 70 employees as Anglo American exited the project.[9] On November 28, 2013, Thiessen acknowledge that Anglo American's departure was "tough news" and suggested that permitting would be delayed until Northern Dynasty found the "right partner for Alaska" to serve as a co-developer.[10] Thiessen reasserted his confidence in locating a new project co-developer in subsequent weeks. For example, on December 13, 2013, he explained:

> Our primary focus is to select the right partner for Northern Dynasty and the right investor for Alaska, a company with sufficient financial resources and technical capabilities, working experience in the United States and a shared commitment to environmentally sound and socially responsible development. ***We have little doubt that Pebble will attract major mining company interest in the months ahead***.[11]

### C. Kerrisdale Capital Releases Report Undermining Northern Dynasty's False Narrative

42. Following President Trump's victory, Defendants seized on the narrative that Northern Dynasty's regulatory woes, which were constant under the

---

[9] *See* L. Demer, "Without Monied Partner, Pebble Cuts Staff, Ends Contracts", *Anchorage Daily News*, dated Pct. 7, 2013, *available at*: https://www.adn.com/alaska-news/article/without-monied-partner-pebble-cuts-staff-ends-contracts/2013/10/07/.

[10] R. Thiessen, "Compass: Pebble is Alive and Waiting for a New Investor", *Anchorage Daily News*, dated Nov. 28, 2013, *available at*: https://www.adn.com/voices/article/compass-pebble-alive-and-waiting-new-investor/2013/11/27/.

[11] *See* n.8, *supra*, Kommenic, "Northern Dynasty", dated Dec. 13, 2013.

Obama administration's EPA, would fade away under the incoming Trump's administration EPA. For example, Defendant Thiessen explained to investors in January 2017 that the Trump administration had "a desire to permit Pebble" and that lingering EPA issues would be resolved "within 100 days."[12] In an interview with *Mining News*, Thiessen explained that "[t]he stars that were previously askew, they seem to be lining up" and Pebble Project CEO Collier acknowledged the surprising result and called the Trump victory a "game changer."[13]

43. Defendants *did not* tamp down investors' expectations following the election. Investors, not privy to Defendants' private misgivings, adopted the narrative that a significant mining project finally would move forward once it was unshackled by regulatory concerns. The stock price of Northern Dynasty surged. And the Company capitalized on renewed investor optimism by raising an additional $37.4 million through a January 2017 secondary offering that marketed the Company's plan to develop the Pebble Project during the first four years of the Trump administration. The *New Yorker* subsequently captured the unbridled investor optimism:

---

[12] *See* N. Pearson, "Northern Dynasty Says It Has Trump Backing, Seeking New Partner," Bloomberg, dated Jan. 23, 2017, *available at*: https://www.bloomberg.com/news/articles/2017-01-23/northern-dynasty-says-it-has-trump-backing-seeking-new-partner.

[13] S. Lasley, "Pebble stars align. Trump, expected EPA treaty, improved markets bode well for Alaska project," *Mining News*, dated Feb. 5, 2017, *available at*: http://www.petroleumnews.com/pntruncate/116537882.shtml.

> On November 9th, the day after Donald Trump won, Northern Dynasty's share price jumped twenty-five per cent; by early February of this year, it had more than quadrupled in value. Soon the company was being touted as a virtual sure thing in investor newsletters and chat rooms—"Trump's gold" became a popular refrain. The financial press echoed the storyline. The *Alaska Journal of Commerce* titled one article "Pebble Revived," while the *Globe and Mail* headlined a *Bloomberg* story with "Trump Makes Canadian Mine Explorer with Zero Revenue Great Again."[14]

44. On February 14, 2017, Kerrisdale Capital Management LLC ("Kerrisdale Capital), a hedge fund specializing in short-sale positions, published a research report, entitled "Northern Dynasty Minerals Ltd. (NAK): Cu at Zero", setting forth a short investment thesis.[15] As indicated by the report's title, Kerrisdale Capital argued that Northern Dynasty was "worthless" as the economic realities were the Pebble Project's Achilles' heel, and not regulatory concerns.[16] This analysis ran directly contrary to popular sentiment and Defendants' endorsed narrative of growth stemming from a looser regulatory approval process. Kerrisdale Capital's conclusion is excerpted below:

> ***Northern Dynasty has skillfully exploited the Trump narrative to reignite enthusiasm for a company that the market had left for dead.***

---

[14] *See* T. Sohn, "Alaska's Pebble Mine and the Legend of Trump's Gold," *New Yorker*, dated Mar. 2, 2017, *available at*: https://www.newyorker.com/tech/elements/alaskas-pebble-mine-and-the-legend-of-trumps-gold.

[15] *See* Kerrisdale Capital, "Northern Dynasty Minerals Ltd. (NAK): Cu at Zero", dated Feb. 14, 2017, *available at*: https://www.kerrisdalecap.com/wp-content/uploads/2017/02/Northern-Dynasty-Minerals-NAK.pdf.

[16] "Cu" is a reference to the abbreviation for Copper on the periodic table of elements.

> ***But "telling a good story" is all Northern Dynasty has ever been good at.*** It's not just some stroke of bad luck that everyone who has touched the Pebble deposit, from Teck to Mitsubishi to Rio Tinto to Anglo American to Northern Dynasty itself, has given up on it or tried to; the project is fundamentally and irretrievably flawed, requiring far too much expensive infrastructure to generate an adequate return on investment mining low-grade ore. ***Our discussions with technical experts directly involved in the project indicated that Northern Dynasty itself has long been aware of these fatal flaws but opted to paper them over rather than fess up. Nonetheless, Northern Dynasty can't keep the charade going forever; without a deep-pocketed partner, it will ultimately perish.***

45. The Kerrisdale Capital report provided detailed insider accounts of the stark economic realities that Northern Dynasty would have to confront, even assuming *arguendo* that the Pebble Project received all necessary regulatory approvals. Specifically, Kerrisdale Capital concluded that ***"the upfront capital costs necessary to build and operate the mine are so onerous that the mine isn't commercially viable."*** According to Kerrisdale Capital (and its confidential sources), the economic cost of developing and operating the Pebble Project was what drove away prior development partners and previously prompted Northern Dynasty to market its own interest for sale prior to the Class Period.

46. Kerrisdale Capital relied upon confidential sources who described how Northern Dynasty sought to prevent the release of feasibility studies that contradicted Northern Dynasty's own economic feasibility study released in 2011. Based on its discussions with confidential sources, Kerrisdale Capital concluded that

economic concerns were what ultimately drove Anglo American away from the Pebble Project.

> ***Overall, the work of Anglo and third-party engineers indicated that the likely upfront capital cost of the Pebble project would be roughly $11 to $13 billion – more than double the $4.7 billion figure used in the Northern Dynasty–commissioned 2011 preliminary assessment.*** While Northern Dynasty's estimated operating costs were, in Anglo's view, more realistic, they were still roughly 20% too low. Despite years of effort, engineers not directly affiliated with Northern Dynasty just couldn't find a reasonable scenario where building the Pebble mine yielded a positive net present value – even using standard hurdle rates that did not account for the unusually severe regulatory risk that the project has long suffered from, and even using assumed metal prices higher than those that prevail today. Thus, when Anglo upper management began to pare back its worst projects, Pebble was an easy target. ***The notion that Pebble couldn't generate an adequate return on investment in any realistic scenario is the only thing that makes sense of Anglo's radical actions: walking away from almost $600 million of sunk costs without making any effort to restructure its deal with Northern Dynasty, well before the EPA initiated its veto.***

47. Kerrisdale Capital reported that one former Anglo American engineer associated with the Pebble Project explained the wide gap between Northern Dynasty and Anglo American's project estimates by stating:

> ***If we [Anglo American] think 13 [billion dollars of upfront capital costs], and the other guys are saying 4, if we're on the far side, you know, you could turn that down to perhaps 8 to 10, but to turn it down to 4 is just getting to the art of the ridiculous.*** It's just too close to the bone. I mean, you'll battle to operate a plant like that – especially in a remote environment where weather conditions are not easy to deal with in the best stretch.…***We were always fighting them on the basis that they thought this could be easier.… I mean, we live in the real world.…The reality is, is that practical? I don't think so.***

48. That Anglo American ultimately determined that the Pebble Project was not economically viable was foreseeable for Northern Dynasty based on disputes over project development assumptions along the way. Kerrisdale Capital reported that tensions emerged between Northern Dynasty and Anglo American as specific cost assumptions were developed and "Northern Dynasty representatives repeatedly pressured Anglo American and third-party engineers to slash their estimates of how high these infrastructure costs would run." Recounting the narrative of one engineer describing discussions over the mine's proposed power plant, Kerrisdale Capital reported:

> ***Obviously HDI Mining [i.e. Hunter Dickinson Inc., Northern Dynasty's management company] didn't like those figures, and they started taking the team to task about it….They were trying to sell a positive story, while Anglo erred rather toward a conservative side of things. … It's lots of challenge.*** You have to bring your own power. You've got to bring your own food, your own buildings. You've got to bring everything yourself – and then, to think 240 megawatts would do it?…I've got tangible figures, and I would like people to come and argue with me, because maybe there's something that I didn't know. ***And they [Northern Dynasty] just came in there with, in my view, a hidden agenda of telling a good story….Some people always want to tell a good story to get their bonuses.***

49. The same engineer went on to explain to Kerrisdale Capital that "[c]ost was everything, . . . HDI Mining was blowing down the project team members' neck to reduce costs, reduce costs. . . . They always tried to cut back on capital." The engineer concerns were confirmed by another source which told Kerrisdale Capital "that Northern Dynasty lowballed the realistic power requirements of the project,

recalling that, whenever the company saw backup power in a mine design, 'they would cut that down to a minimum to begin with – and then some.'"

50. The tensions between Anglo American and Kerrisdale Capital reached a breaking point prior to Anglo American existing the project. Kerrisdale Capital asserted that Northern Dynasty actively sought to avoid receiving cost analyses that contradicted its 2011 economic analysis. This claim was rooted in the account of one source (and confirmed by a second source) who told Kerrisdale:

> ***What's interesting is, as we were about to issue our PFS [pre-feasibility study] that we came up [with] in 2012 or so, they [Northern Dynasty] stopped us finishing that PFS. We weren't supposed to issue the report, you see. We were coming up with 13 billion in capital.***

51. Kerrisdale Capital attributed this stop work order on Northern Dynasty's desire to remain willfully ignorant of any official conclusion that contradicted prior analyses: "Based on our discussions, ***Anglo personnel believed that Northern Dynasty wanted to avoid disclosure requirements under Canadian securities law.*** In other words, according to people directly involved in the Pebble project, Northern Dynasty knew that the Anglo analysis had found that Pebble was worse than worthless but did everything it could to keep that information out of shareholders' hands."

52. Even if Kerrisdale Capital overreached in drawing this conclusion, the hedge fund's sources provide detailed description supporting the more general claim that Anglo American exited the Pebble Project because of economics. This view is

consistent with the language that Anglo American used to describe its write-down decision to its own investors, as discussed above, *see* Section IV.B, *supra*. Namely, during a December 12, 2013 investor call, Anglo American's Finance Director explained, "we have eliminated some of ***what we consider constrained options like Pebble in Alaska***." The same description of Pebble as a "constrained option" was used in the accompanying investor presentation in the context of explaining Anglo American's portfolio optimization strategy.

53. Defendants did not disclose that Anglo American harbored serious doubts concerning the economic feasibility of the mine based on the cost projections it developed. For example, according to the Kerrisdale Capital report, Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low. Defendants instead sought to convince investors that another large, multi-national mining company willingly walked away from a more than $500 million investment due to extenuating circumstances not attributable to the Pebble Project's near-term viability as a commercial venture. Indeed, during early 2017, Defendant Thiessen seemingly recognized that other development partners were prone to reaching the same conclusions as Northern Dynasty's former partners and suggested, ***"We may be best served to take a more modest approach"*** and that the

mine design that ultimately goes to permitting may be half the size.[17] Still, these economic concerns *were not* adequately disclosed to investor until the Kerrisdale Report was published.

## V. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSEAND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD

54. Throughout the Class Period and as detailed in the Kerrisdale Capital report, Defendants were informed by Anglo American and third-party engineers that the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011 and that Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable. Additionally, according to the Kerrisdale Capital report, Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low. In spite of this, Defendants failed to disclose these facts to investors and the marketplace.

### A. Defendants' False and Misleading Statements Disseminated to the Public on September 16, 2013

55. The Class Period starts on September 16, 2013. On that date, the Company issued a press release entitled, "Anglo American Withdraws from Pebble Project." Therein, the Company, in relevant part, stated:

> Northern Dynasty Minerals Ltd. (TSX: NDM; NYSE MKT: NAK) ("Northern Dynasty" or the "Company") reports that Anglo American

---

[17] *See* S. Lasley, "Pebble stars align - Trump, expected EPA treaty, improved markets bode well for Alaska project", *Mining News*, dated Feb. 5, 2017, *available at*: http://www.petroleumnews.com/pntruncate/116537882.shtml.

> (US) Pebble LLC ("AA Pebble"), a wholly owned US subsidiary of Anglo American plc ("Anglo American"), has given notice under the Pebble limited partnership agreement that it is withdrawing from the Pebble copper project in Alaska.
>
> ***
>
> Northern Dynasty CEO Ron Thiessen commented "Northern Dynasty will again own 100% of one of the world's most important copper & gold resources and will have the benefit of $541 million worth of expenditures, which opens the door to a number of exciting possibilities for Northern Dynasty and its shareholders and the Pebble Project and its stakeholders. Northern Dynasty and the Pebble Partnership have both the expertise and resources necessary to advance the Pebble Project."

56. On September 16, 2013, the Company held a conference call with analysts and investors to discuss Anglo American's withdrawal from the Pebble Project. Therein, Defendant Thiessen, in relevant part, stated:

> I think going forward, I think in terms of Anglo's decision, Mark Cutifani's quote that this is not about Pebble, it is about Anglo, best defines to the best I can gather Anglo's position that they had other extenuating circumstances, which just in the unfortunate circumstance for them, let them to this position ultimately.
>
> From NDM standpoint, this means that we will now be back in possession of 100% of the Pebble projects, and the beneficiary of something north of $540 million worth of expenditures by Anglo over the last five years, a tremendous database and one which provides us with the opportunity to completely evaluate this project, and we're in a position where we are 99% complete on I would say the project description, which is the functional document for permitting purposes.
>
> ***
>
> Some questions that people are asking is what's going to happen vis-à-vis the technical capabilities of Pebble Limited Partnership, given the fact that all of this money has been spent by Anglo and they have

> seconded some engineers into the project, I mean we are functionally done with all the heavy lifting and what remains really for the project is the permitting process, so I think moving forward the partnership itself, while there is likely to be downsizing in capacity, we won't miss any of the technical capabilities that will be withdrawn by Anglo when they leave.

57. Additionally, on this same conference call, an analyst asked "the curious question is why, why Anglo would withdrawal if [the project description] was [] close to 99% complete?" In response, Defendant Thiessen, in relevant part, stated:

> I mean the reality was last week, there were two groups of partner representatives Northern Dynasty and Anglo up in Anchorage going through what I call the penultimate draft of the project description and they reported back generally that it's in very good shape and even from the PLP staff, I heard that – that the amount of partner involvement, recommendation, suggestion was greatly appreciated and so, I think it's very close to a finished product.
>
> ***
>
> ***And I think, the reason they decided to withdrawal was in terms of the timing, again I go back, I think, it simply had to do with their budgeting and cash flow cycling*** that typically we would try and get programs and budgets in a preliminary state done for them for October, November for the ensuing year, many times we'll get – actually come to final determinations but we were generally within a plus/minus 20% by fall for the ensuing year.

58. As detailed in the Kerrisdale Capital report (*see* Section IV.C, *supra*), these statements concerning Anglo American's withdrawal from the Pebble Project and the purported rationale for this withdrawal were materially false or misleading when made, or omitted to state material facts necessary to make the statements not

misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

### B. <u>Defendants' False and Misleading Statements Disseminated to the Public on September 23, 2013</u>

59. On September 23, 2013, Northern Dynasty gave a presentation with slideshow at the Denver Gold Forum. In this slideshow, Northern Dynasty represented that the 2011 preliminary assessment determined the capital cost of the Pebble Project would be $4.695 billion.

60. The presentation, however, was false and misleading since the Company failed to disclose that, according to the Kerrisdale Capital report, Anglo American and third-party engineers had informed Defendants that the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011 and that the Company actively sought to avoid receiving cost analyses that contradicted its 2011 preliminary assessment.

### C. Defendants' False and Misleading Statements Disseminated to the Public on December 13, 2013

61. On December 13, 2013, the Company issued a press release entitled, "Anglo American completes withdrawal from the Pebble Limited Partnership." Therein, the Company, in relevant part, stated:

> Northern Dynasty Minerals Ltd. (TSX: NDM; NYSE MKT: NAK) ("Northern Dynasty" or the "Company") announces that it has exercised its right to acquire Anglo American (US) Pebble LLC's ("Anglo American") interest in the Pebble Limited Partnership ("Pebble Partnership" or "PLP"). Northern Dynasty has now re-acquired 100% ownership and control of the Pebble Partnership. All Anglo American representatives have resigned from the Pebble Mines Corporation Board of Directors.
>
> "During the course of the last six years and at a cost of US$556 million (as of September 30, 2013), substantial progress has been made toward our goal of permitting, constructing and operating a world-class, modern and environmentally responsible mine at Pebble that will co-exist with the fisheries resources of southwest Alaska," said Northern Dynasty President & CEO Ronald Thiessen.
>
> Thiessen said Pebble's engineering design, environmental science and regulatory planning are now sufficiently advanced that PLP will be in a position to trigger federal and state permitting under the National Environmental Policy Act (NEPA) in the first quarter of 2014. He added that Northern Dynasty's current focus is to consolidate all of the technical data, engineering work and permitting documentation related to Pebble into a data room, with the goal of qualifying and securing a new partner in 2014. A final decision on permit filing will be made in 2014, by the Northern Dynasty Board.
>
> "Our primary focus is to select the right partner for Northern Dynasty and the right investor for Alaska, a company with sufficient financial resources and technical capabilities, working experience in the United States and a shared commitment to environmentally sound and socially responsible development. We have little doubt that Pebble will attract major mining company interest in the months ahead."

62. As detailed in the Kerrisdale Capital report (*see* Section IV.C, *supra*), these statements concerning Anglo American's withdrawal from the Pebble Project were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

**D. <u>Defendants' False and Misleading Statements Disseminated to the Public on March 27, 2014</u>**

63. On March 27, 2014, Northern Dynasty filed its Annual Report with the SEC on Form 40-F for its 2013 fiscal year. The Company's Form 40-F was signed by Defendant Thiessen. Therein, the Company, in relevant part, stated that additional engineering, environmental and socioeconomic studies and data collection had not obviated its 2011 preliminary assessment:

> ***In February 2011, Northern Dynasty announced the results of an independent Preliminary Assessment ("2011 PA") of the Pebble Project by Wardrop, a Tetra Tech Company.*** The 2011 PA analyzed the economics of three successive mine development models comprising 25, 45 and 78 years of open pit mining each at a nominal processing rate of 200,000 tons per day. The results of the 2011 PA indicated the potential for positive returns on invested capital in a mine.

> The phase of engineering work which began in 2011 has included additional analysis of various mine and process plant designs, and alternative associated infrastructure options, along with the study of potential designs for a variety of potential transportation infrastructure and power supply options.
>
> ***Although additional engineering, environmental and socioeconomic studies and data collection programs designed to advance a planned prefeasibility study for the Pebble Project continued from 2011 through early 2013, this work was not sufficiently comprehensive or material to obviate the 2011 PA analyses and conclusions. However, since the withdrawal of Anglo American from the Pebble Partnership in late 2013 and in light of more recent stakeholder and regulatory feedback, Northern Dynasty has initiated a comprehensive review of previous analyses of the Pebble project, including the 2011 PA and various project components.*** Current studies of the Pebble project investigate new infrastructure plans as well as lower throughput rates in a revised project development concept. As well, the cost and revenue inputs require complete updating given the nearly 4 years which have passed since the 2011 PA work was done. For these reasons, any project at Pebble which is ultimately put forward for permitting will almost certainly be different from the economic assessment model examined in the 2011 PA. Therefore the conclusions in the 2011 PA study have very limited going-forward relevance at this time and, accordingly, its conclusions have not been repeated in this AIF. There can be no assurances given by Northern Dynasty that the economics of the new alternative mine models being assessed will demonstrate economics similar to those projected in the 2011 PA.

64. As detailed in the Kerrisdale Capital report (*see* Section IV.C, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo

American had withdrawn from the project since it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

65. Moreover, these statements were additionally false or misleading, or omitted to state material facts necessary to make the statements not misleading, because Defendants failed to disclose that, according to the Kerrisdale Capital report, Northern Dynasty actively sought to avoid the publication of the 2012 pre-feasibility study since it contained an estimate of $13 billion, which was more than twice the amount contained in the 2011 assessment. Therefore, Defendants statement "***this work was not sufficiently comprehensive or material to obviate the 2011 PA analyses and conclusions***" was intentionally misleading because it was Defendants who had purposely ignored the contents of the 2012 study and stopped its results from being issued based on their own self-serving determination that the results somehow were not material.

**E. Defendants' False and Misleading Statements Disseminated to the Public on May 15, 2015**

66. On May 15, 2015, Northern Dynasty filed its Annual Report with the SEC on Form 20-F for its 2014 fiscal year. The Company's Form 20-F was signed by Defendant Snyman. Therein, the Company, in relevant part, stated that:

> Until December 10, 2013, Northern Dynasty Partnership ("Northern Dynasty") and Anglo American US (Pebble) LLC. ("Anglo"), wholly-owned US affiliates of Northern Dynasty Minerals Ltd. and Anglo American plc. respectively, had equal rights in the Pebble Partnership as the limited partners, and each owned 50% of the outstanding shares

> of the general partner, Pebble Mines Corp. To maintain its 50% interest in the Pebble Partnership, Anglo was required to make staged cash investments into the Pebble Partnership aggregating to $1.5 billion (described below). On September 15, 2013, Anglo gave notice to Northern Dynasty of its withdrawal from the Pebble Partnership. On December 10, 2013, Northern Dynasty exercised its right to acquire Anglo's 50% interest and consequently holds a 100% interest in the Pebble Partnership and in the Pebble Partnership's general partner, Pebble Mines Corp. (which administers the Pebble Project). Anglo contributed $573.2 million (December 31, 2012 - $504.2 million) to the Pebble Partnership as of December 10, 2013.

67. As detailed in the Kerrisdale Capital report (*see* Section IV.C, *supra*), these statements concerning Anglo American's withdrawal from the Pebble Project were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

**F. <u>Defendants' False and Misleading Statements Disseminated to the Public on May 2, 2016</u>**

68. On May 2, 2016, Northern Dynasty filed its Annual Report with the SEC on Form 20-F for its 2015 fiscal year. The Company's Form 20-F was signed by Defendant Snyman. Therein, the Company, in relevant part, stated that:

> Until December 10, 2013, Northern Dynasty Partnership ("Northern Dynasty") and Anglo American US (Pebble) LLC. ("Anglo"), wholly-owned US affiliates of Northern Dynasty Minerals Ltd. and Anglo American plc. respectively, had equal rights in the Pebble Partnership as the limited partners, and each owned 50% of the outstanding shares of the general partner, Pebble Mines Corp. To maintain its 50% interest in the Pebble Partnership, Anglo was required to make staged cash investments into the Pebble Partnership aggregating to $1.5 billion (described below). On September 15, 2013, Anglo gave notice to Northern Dynasty of its withdrawal from the Pebble Partnership. On December 10, 2013, Northern Dynasty exercised its right to acquire Anglo's 50% interest and consequently holds a 100% interest in the Pebble Partnership and in the Pebble Partnership's general partner, Pebble Mines Corp. (which administers the Pebble Project). Anglo contributed $573.2 million to the Pebble Partnership as of December 10, 2013.

69. As detailed in the Kerrisdale Capital report (*see* Section IV.C, *supra*), these statements concerning Anglo American's withdrawal from the Pebble Project were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

## VI. DISCLOSURES AT THE END OF THE CLASS PERIOD

70. On February 14, 2017, Kerrisdale Capital issued a press release at 9:30 a.m. Eastern announcing the publication of its report entitled "Northern Dynasty Minerals Ltd. (NAK): Cu at Zero." As discussed above, *see* Section IV.C, *supra*, Kerrisdale Capital determined that, contrary to Northern Dynasty's repeated suggestions otherwise, the Pebble Project was not commercially viable and that investor enthusiasm for the Company's prospects were misplaced.

71. Upon recognizing that investors immediately seized on the Kerrisdale Capital report, Northern Dynasty disclaimed the accuracy of the Kerrisdale Capital report within hours of its release. In fact, Northern Dynasty issued a preliminary response prior to the close of trading and pledged to explain away Kerrisdale Capital's "short and distort campaign" in the coming days. The Company's response did not allay investor concerns. On February 14, 2017, Northern Dynasty shares lost over 21% of their value − on extremely high trading volume of more than 65 million shares, falling from $3.18 per share on February 13, 2017 to close at $2.50 per share on February 14, 2017. Moreover, the February 14, 2017 intra-day low was $1.92 per share.

72. On February 17, 2017, Northern Dynasty released its formal response to the Kerrisdale Capital report following the close of trading. In its response, Northern Dynasty argued that the report was premised upon misstatements, inaccuracies and "anonymous sources." Rather than confront Kerrisdale Capital's

assertion that the Company suppressed the release of contrary economic assessment, Northern Dynasty focused on how the only official preliminary economic assessment ("PEA") report from 2011 reached alternate conclusions. The Company chose to elide serious discussion of the economic analyses set forth in the Kerrisdale Capital report. Likewise, the Company urged investors to focus on polite statements uttered by Anglo American as that multinational mining concern walked away from its over $500 million investment in the Pebble Project to focus on less "constrained" development opportunities.

73. Northern Dynasty's formal response *did not* arrest the stock price decline. On the following trading day, February 21, 2017, Northern Dynasty shares fell to $1.66, down from $2.26 on February 17, 2017, again on unusually high trading volume. The stock price reaction suggests that investors generally were unconvinced by the Company's competing narrative.[18]

## VII. MATERIALITY

74. Following the publication of the Kerrisdale Capital report, investor confidence in Northern Dynasty was shattered and an immediate decline in the price

---

[18] Critically, Sahm Adragni, founder of Kerrisdale Capital, reaffirmed his firm's short thesis following Northern Dynasty's strident rebuttal. In a *New Yorker* article published after Northern Dynasty released its official response, Adragni remarked, "The more we dug into it, the more excited we got, because it seemed like this whole thing was just smoke and mirrors, . . . I don't think we've ever received this much praise on a report." *See* T. Sohn, "Alaska's Pebble Mine and the Legend of Trump's Gold," *New Yorker*, dated Mar. 2, 2017, *available at*: https://www.newyorker.com/tech/elements/alaskas-pebble-mine-and-the-legend-of-trumps-gold.

of Northern Dynasty shares ensued. On the first day of trading following publication of the Kerrisdale Capital report, Northern Dynasty shares lost over 21% of their value − on extremely high trading volume of more than 65 million shares. This sharp and immediate market reaction is an extremely practical and clear indicator of materiality. More specifically, the price reaction demonstrates the impact of the publication of the Kerrisdale Capital report and the preceding materially false and misleading public statements and omissions, which were corrected by the report, had on the market's assessment of the value of Northern Dynasty's stock.

75. Materiality is also evidenced by Northern Dynasty's own statements in the Form 20-F filed with the SEC on May 2, 2016. In this public filing, Northern Dynasty emphasized that demonstrating "the Company will ultimately be able to demonstrate that a mine at the Pebble Project can be developed and operated in an environmentally sound and socially responsible manner . . ." was its paramount object. During the Class Period, Defendants created the false and/or materially misleading impression that Northern Dynasty would be to execute its development strategy subject to regulatory approval. As discussed above, Defendants did not adequately disclose to investors their private misgivings or the apparent skepticism of its prior development partners who abandoned the project after recognizing that the economic feasibility of the Pebble Project was dubious.

76. Yet, in the Risk Factors Section of the same Form 20-F with the SEC, the Company acknowledged that the economic and operational feasibility of developing the Pebble Project were material considerations for investors. Excerpts of the Company's risk disclosures include:

> **The Company will be required to seek additional capital; the Company's inability to obtain additional capital could have a material adverse effect on its operations**
>
> While the Company has prioritized the available resources in order to meet key corporate and Pebble Project expenditure requirements, the Company will seek to source significant additional financing. ***Such financing may include any of, or a combination of: debt, equity and/or contributions from possible new Pebble Project participants.*** In light of the recent significant depreciation of the Canadian dollar and that the vast majority of the Company's expenditures are in United States dollars, that the Pebble Project will require additional engineering and technical expenditures beyond what is contemplated in the current budget, and the possibility that expenditures to pursue the Company's Multi-Dimensional Strategy, including legal expenditures may exceed current budget expectations, it is possible that additional financing may well be required. ***There can be no assurances that the Company will be successful in obtaining any such additional financing. If the Company is unable to raise the necessary capital resources to meet obligations as they come due, the Company will at some point have to further reduce or curtail its operations.***
>
> **Negative Operating Cash Flow**
>
> The Company currently has a negative operating cash flow and will continue to have that for the foreseeable future. ***Accordingly, the Company will require substantial additional capital in order to fund its future exploration and development activities. The Company does not have any arrangements in place for this funding and there is no assurance that such funding will be achieved when required.*** Any failure to obtain additional financing or failure to achieve profitability and positive operating cash flows will have a material adverse effect on its financial condition and results of operations.

***

**Northern Dynasty will require additional funding to meet the development objectives of the Pebble Project.**

Northern Dynasty will need to raise additional financing to achieve permitting and development of the Pebble Project. In addition, a positive production decision at the Pebble Project would require significant capital for project engineering and construction. ***Accordingly, the continuing development of the Pebble Project will depend upon Northern Dynasty's ability to obtain financing through debt financing, equity financing, the joint venturing of the project, or other sources of financing. There can be no assurance that Northern Dynasty will be successful in obtaining the required financing, or that it will be able to raise the funds on terms that do not result in high levels of dilution to shareholders.***

**The Pebble Partnership's mineral property interests do not contain any ore reserves or any known body of economic mineralization.**

Although there are known bodies of mineralization on the Pebble Project, and the Pebble Partnership has completed core drilling programs within, and adjacent to, the deposits to determine measured and indicated resources, ***there are currently no known reserves or body of commercially viable ore and the Pebble Project must be considered an exploration prospect only.*** Extensive additional work is required before Northern Dynasty or the Pebble Partnership can ascertain if any mineralization may be economic and hence constitute "ore".

**Mineral Resources disclosed by Northern Dynasty or the Pebble Partnership for the Pebble Project are estimates only.**

Northern Dynasty has included mineral resource estimates that have been made in accordance with National Instrument 43-101. These resource estimates are classified as "measured resources", "indicated resources" and "inferred resources." Northern Dynasty advises investors that while these terms are mandated by Canadian securities administrators, the U.S. Securities and Exchange Commission does not recognize these terms. ***Investors are cautioned not to assume that any part or all of mineral deposits classified as "measured resources" or***

> ***"indicated resources" will ever be converted into ore reserves. Further, "inferred resources" have a great amount of uncertainty as to their existence, and economic and legal feasibility. It cannot be assumed that all or any part of an inferred mineral resource will ever be upgraded to a higher category.*** Under Canadian rules, estimates of inferred mineral resources may not form the basis of feasibility or prefeasibility studies, except in rare cases. Investors are cautioned not to assume that part or all of an inferred resource exists, or is economically or legally mineable.
>
> All amounts of mineral resources are estimates only, and Northern Dynasty cannot be certain that any specified level of recovery of metals from the mineralized material will in fact be realized or that the Pebble Project or any other identified mineral deposit will ever qualify as a commercially mineable (or viable) ore body that can be economically exploited. Mineralized material which is not mineral reserves does not have demonstrated economic viability. ***In addition, the quantity of mineral reserves and mineral resources may vary depending on, among other things, metal prices and actual results of mining. There can be no assurance that any future economic or technical assessments undertaken by the Company with respect to the Pebble Project will demonstrate positive economics or feasibility***.

77. This above-referenced language paid lip-service to the material economic risks associated with developing the Pebble Project; however, Defendants did not fully disclose to investors the extent to which these risks had already materialized and impacted the Pebble Project's development prior to the start of the Class Period.[19] The Kerrisdale Capital report, however, corrected Defendants' Class

---

[19] Notably, Defendant Thiessen adopted a similar view to required risk warnings in his letter to the California Controller and New York City Comptroller. He noted, "In reality, all publicly traded mining companies disclose similar risk factors" "in response to specific legal requirements" and went on to suggest that "there would be insufficient investment in production of the commodities necessary for a healthy modern society" if investors "were to avoid investing in mining and other resource companies" based on similar risk factors. *See* Letter from John Thiessen (CEO,

Period statements concerning the economic and risks relating to the development of the Pebble Project, which were materially false and/or misleading.

## VIII. LOSS CAUSATION

78. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Northern Dynasty common stock and operated as a fraud or deceit on Class Period purchasers of Northern Dynasty common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Northern Dynasty common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

79. As a result of their purchases of Northern Dynasty common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Northern Dynasty

---

Northern Dynasty) to John Chiang (Controller, State of California) and John Liu (Comptroller, New York City), dated Jan. 7, 2014, *available at*: https://www.eenews.net/assets/2014/02/10/document_pm_01.pdf. As suggested by the California Controller and New York City Comptroller's reliance on similar risk warnings, these disclosures were material to investors. But as indicated by Defendant Thiessen's own remarks, Northern Dynasty recognized that these legally required disclosures were no more than mere boilerplate.

common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $3.36 share on February 10, 2017.

80. The truth was revealed on February 14, 2017, when, as alleged above, Kerrisdale Capital published a research report which described why Defendants' Class Period representations concerning the commercial viability of the Pebble Project were materially false and/or misleading. Investors reacted sharply to the contents of the Kerrisdale Capital report. Following the February 14, 2017 publication of the Kerrisdale Capital report, Northern Dynasty's stock price plummeted more than 21% on unusually heavy trading volume, falling from a close of $3.18 per share on February 13, 2017, to a close of $2.50 per share on February 14, 2017, causing millions of dollars in investor losses. In the days that followed, Northern Dynasty stock continued to decline, sinking to $2.26 by February 17, 2017 to close the week as investors digested the full impact of Defendants' materially misleading statements and deliberately reckless acts. The price of Northern Dynasty shares continued to decline in subsequent weeks and closed as low as $1.08 on March 14, 2017.

81. The market's negative reaction to the February 14, 2017 revelations is demonstrated by the following chart:




82. The timing and magnitude of Northern Dynasty's stock price decline between February 13, 2017 and February 14, 2017 negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct. For example, in its Class Period investor presentations, Northern Dynasty frequently compared its stock price performance to that of the S&P/TSX Composite Materials Sector Index. After the truth became known to the market on February 14, 2017, shares of Northern Dynasty fell more than 21%. By way of contrast, the price of the S&P/TSX Composite Materials Sector Index fell less than 1% on the same day.

83. By concealing from investors the adverse facts detailed above, Defendants presented a misleading picture of Northern Dynasty's business and

future financial prospects. When the truth about the Company was revealed to the market following the release of the Kerrisdale Capital report, the price of Northern Dynasty common stock fell significantly. The declines in the price of Northern Dynasty common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who had purchased Northern Dynasty common stock during the Class Period.

84. In addition, analysts and investors directly attributed this price decline to the Kerrisdale Capital report, which corrected Defendants' prior false and misleading Class Period statements. The declines in the price of Northern Dynasty common stock after the corrective disclosures (*see* ¶¶80-81), came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.

85. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Northern Dynasty common stock and the subsequent significant declines in the value of Northern Dynasty common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

86. The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the true costs and feasibility of the Pebble Project, and Anglo American's rationale for abandoning the project; (b) their intentional

issuance of materially false or misleading statements regarding the true costs and feasibility of the Pebble Project, and Anglo American's rationale for abandoning the project; and/or (c) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

87. The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiffs and the Class.

### A. <u>The Development of the Pebble Project Was the Company's Only Undertaking</u>

88. Northern Dynasty's sole corporate purpose is to attempt develop the Pebble Project. As the Company's 2015 Annual Report explained:

> …**the Pebble Project is Northern Dynasty's principal mineral property interest…**
>
> ***
>
> The Pebble Project is, through the Pebble Partnership, Northern Dynasty's principal mineral property interest. ***Northern Dynasty's principal business objective is to carry out further exploration and***

> ***related activities to establish whether the Pebble Project possesses commercially viable deposits of ore.*** If Northern Dynasty is not successful in its plan of operations, Northern Dynasty may have to seek a new mineral property to explore or acquire an interest in a new mineral property or project.

89. Essentially, the Individual Defendants' primary jobs were to oversee and manage exploration and related activities of the Pebble Project. It is unfathomable that the Individual Defendants were not aware of the cost estimates provided by its primary financial partner, Anglo American, that had spent $541 million on the project and was committed to spend almost $1 billion more or that Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable. Moreover, as described in the Kerrisdale Report, Northern Dynasty actively sought to avoid receiving cost analyses so that it could public maintain the validity of its 2011 cost estimate. Only, high ranking executives such as the Individual Defendants had the authority to prevent the issuance of the reports that had higher cost estimates or make the determination that these reports "was not sufficiently comprehensive or material to obviate the 2011 PA analyses and conclusions."

90. In the event that the Company's CEOs and CFOs were unaware of these facts, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Lead Plaintiff and other Class members. However, the most reasonable inference from the fact that the development of the Pebble Project was the Company's primary endeavor is that the Individual

Defendants were aware that the project would be substantially more expensive than was previously claimed.

**B. Defendant Thiessen Was a Substantial Shareholder of the Company**

91. According to the Company, as of December 31, 2015, Defendant Thiessen owned or controlled 2,758,878 shares of Northern Dynasty common stock. It is simply illogical that Defendants Thiessen, who had a financial interest in almost 3 million shares of Northern Dynasty stock and controlled the Company as CEO, was not aware of the status of the Company's sole project.

**C. Northern Dynasty Was a Small Company**

92. Northern Dynasty is an extremely small company. For example, at the start of the Class Period, the Company only had about "70 or so direct employees."[20] Soon thereafter, the amount of the Company's employees drastically shrank. By December 31, 2014, the Company and its subsidiaries had only 12 full time employees according to the Company's 2014 annual report. For a company with so few employees during the Class Period, it is simply implausible that senior management did not see all studies completed by, or provided to, the Company concerning the costs and feasibility of the Pebble Project.

---

[20] L. Demer, "Without monied partner, Pebble cuts staff, ends contracts," *Anchorage Daily News*, dated Oct. 7, 2013, *available at*: https://www.adn.com/alaska-news/article/without-monied-partner-pebble-cuts-staff-ends-contracts/2013/10/07/

### D. Northern Dynasty Executives Were Aware of Competing Estimates But Focused Investors on Outdated 2011 Assessment

93. Northern Dynasty focused investors throughout the Class Period on the 2011 Preliminary Assessment which estimated that development costs would only total approximately $4.7 billion. In accord with the Kerrisdale Capital report, other evidence suggests that Defendants were likely aware of subsequent higher costs estimates, but *did not* focus investors on competing scenarios which were not disclosed in SEC filings or widely publicized.

94. For example, John Shivley ("Shivley"), the former CEO of the Pebble Partnership, explained, in a July 2012 FrontLine documentary titled "Alaska Gold", that "[i]t's a very complicated project. I mean, it's a mine, and it's a significant size mine. It's an 86-mile road. It's a brand-new port and it's a power plant."[21] In support of this proposition, Shivley remarked in passing that "It's going to be probably at least a $7 billion or $8 billion investment just to get us up and running." A single line concerning that estimate in an approximately 53-minute long documentary, primarily focused on Northern Dynasty's environmental impact, however, would not capture investors' attention. Shevley's statement was not mentioned in any SEC filings of press releases from the Company, it was not addressed direction in any of the Company's public statements, nor did it receive

[21] *Id.*

any press coverage. Defendants, however, repeatedly emphasized on the $4.7 billion figure in investor presentations.

95. Likewise, Cynthia Carroll ("Carroll"), Anglo American's former CEO and a proponent of the Pebble Project, acknowledged that she wanted to be "clear" that the 2011 Preliminary Assessment was "just one view" of the project March 3, 2011 breakfast meeting of the Resource Development Council.[22] Carroll added:

> Northern Dynasty feels they need to provide information about the project to their shareholders even though that information is still preliminary. The Pebble Partnership will only publish a detailed plan once that has been properly developed and approved by Pebble's board. The fact is that the Pebble Partnership is still studying multiple options as it works towards completion of a pre-feasibility study in 2012.

96. Thus, Anglo American made clear that the February 2011 Preliminary Assessment *was not* intended to viewed as a "near final" draft. In fact, in its March 29, 2011 Annual Report, Northern Dynasty disclosed that at Anglo American considered the release of the Preliminary Assessment report to violate Anglo American's confidentiality. This further suggests that Northern Dynasty executives likely were aware of competing cost analyses, which were not publicly disclosed to investors. Over the next two years, Northern Dynasty, after its failed sale attempt, and Anglo American continued to develop the Pebble Project until Anglo American left the project in late 2013. Yet, as discussed herein (*see* Section IV.C, *supra*),

---

[22] A. Jensen, "Northern Dynasty looks to sell Pebble stake," Homer News, dated Apr. 27, 2011, *available at*: http://homernews.com/stories/042711/business_nddl.shtml.

according to the Kerrisdale Capital report until it left the project, Anglo American continued to push Northern Dynasty to accept more realistic cost projections and Northern Dynasty demurred. Northern Dynasty's reluctance to disclose to investors competing cost analyses extended through the end of the Class Period.

## X. CLASS ACTION ALLEGATIONS

97. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the common stock of Northern Dynasty during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

98. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Northern Dynasty stock was actively traded on the NYSE American. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Northern Dynasty shares were traded publicly during the Class Period on the NYSE American. As of December 31, 2016, the Company had 270,869,561 shares outstanding. Record owners and other

members of the Class may be identified from records maintained by Northern Dynasty or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99. Lead Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein. Further, Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

100. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' conduct alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Northern Dynasty; and

c. to what extent Class members have sustained damages and the proper measure of damages.

101. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

102. The market for Northern Dynasty securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's stock traded at artificially inflated prices during the Class Period. On February 10, 2017, the Company's stock closed at a Class Period high of $3.36 per share. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Northern Dynasty; Lead Plaintiffs and Class members have been damaged thereby.

103. During the Class Period, the artificial inflation of the value of Northern Dynasty securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Lead Plaintiffs and other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the

Company's securities to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's securities, causing Lead Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

104. At all relevant times, the market for Northern Dynasty stock was efficient for the following reasons, among others:

a. Northern Dynasty's stock met the requirements for listing, and it was listed and actively traded on the NYSE American, a highly efficient and automated market.

b. As a regulated issuer, Northern Dynasty filed periodic public reports with the SEC and/or the NYSE American.

c. Northern Dynasty regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

d. Northern Dynasty was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

105. Based on the foregoing, during the Class Period, the market for Northern Dynasty stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Northern Dynasty stock. Under these circumstances, the market for Northern Dynasty securities was efficient during the Class Period and, therefore, investors' purchases of Northern Dynasty stock at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

106. In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## XII. NO SAFE HARBOR

107. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or

misleading at the time each such statement was made. In addition, as discussed above, *see* n.19, during the Class Period, Defendant Thiessen described risk disclosures as tantamount to statutorily-required boilerplate in connection with disclaiming the significance of risk warnings to the California Controller and New York City Comptroller.

## XIII. COUNTS

### FIRST COUNT
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

108. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This claim is asserted against all Defendants.

109. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Northern Dynasty stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

110. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of

the Company's securities in an effort to maintain artificially high market prices for Northern Dynasty stock in violation of Section 10(b) of the Exchange Act and Rule 10b 5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

111. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Northern Dynasty's business, operations, management, and prospects, as specified herein.

112. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Northern Dynasty's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Northern Dynasty and its operations and financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

113. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

114. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Northern Dynasty's business, operations, management and prospects from the investing public and supporting the artificially inflated price of its

securities. As demonstrated by Defendants' misstatements throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

115. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Northern Dynasty was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Northern Dynasty stock during the Class Period at artificially high prices and were damaged thereby.

116. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Lead Plaintiffs was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other

members of the Class would not have purchased or otherwise acquired their Northern Dynasty securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

117. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder.

118. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND COUNT**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

119. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

120. The Individual Defendants acted as controlling persons of Northern Dynasty within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

121. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

122. As set forth above, Northern Dynasty and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: September 12, 2017

GLANCY PRONGAY & MURRAY LLP

By: *s/ Lionel Z. Glancy*

Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495
Email: lglancy@glancylaw.com

Ira M. Press (admitted *pro hac vice*)
Thomas Elrod (admitted *pro hac vice*)
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com

*Co-Lead Counsel for Lead Plaintiff NDM Investor Group and the Proposed Plaintiff Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On September 12, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 12, 2017, at Los Angeles, California.

*s/ Lionel Z. Glancy*
Lionel Z. Glancy

# Mailing Information for a Case 2:17-cv-01241-PSG-SS Victor Diaz v. Northern Dynasty Minerals Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas M Barba**
  tbarba@steptoe.com
- **Thomas W Elrod**
  telrod@kmllp.com
- **Philip S Khinda**
  pkhinda@steptoe.com,msherman@steptoe.com
- **Jason Levin**
  jlevin@steptoe.com,ehernand@steptoe.com
- **Adam C McCall**
  amccall@zlk.com
- **Patricia B Palacios**
  ppalacios@steptoe.com
- **Ira M Press**
  ipress@kmllp.com,bmirza@kmllp.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`