Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Casey E. Sadler (#274241)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com

*Attorneys for Lead Plaintiff NDM Investor Group and the Proposed Plaintiff Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VICTOR DIAZ, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN DYNASTY MINERALS LTD., RONALD W. THIESSEN, and MARCHAND SNYMAN,<br><br>Defendants. | Case No: 2:17-cv-01241-PSG-SS<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 5

III. PARTIES ........ 6

A. Lead Plaintiffs ........ 6

B. Defendants ........ 6

C. Relevant Non-Parties ........ 8

IV. STATEMENT OF FACTS ........ 9

A. Overview of Northern Dynasty and the Fraught History of the Pebble Project ........ 9

B. Anglo American Abandons the Pebble Project ........ 13

C. Kerrisdale Releases Report Undermining Northern Dynasty's False Narrative ........ 15

V. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSEAND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD ........ 21

A. Defendants' False and Misleading Statements Disseminated to the Public on September 16, 2013 ........ 22

B. Defendants' False and Misleading Statements Disseminated to the Public on September 23, 2013 ........ 24

C. Defendants' False and Misleading Statements Disseminated to the Public on December 13, 2013 ........ 25

D. Defendants' False and Misleading Statements Disseminated to the Public on March 27, 2014 ........ 26

E. Defendants' False and Misleading Statements Disseminated to the Public on May 15, 2015 ........ 28

F. Defendants' False and Misleading Statements Disseminated to the Public on May 2, 2016 ........ 29

VI. DISCLOSURES AT THE END OF THE CLASS PERIOD ........ 29

VII. MATERIALITY ........ 31

VIII. LOSS CAUSATION ........ 32

IX. ADDITIONAL SCIENTER ALLEGATIONS ........ 35

A. Northern Dynasty Was a Small Company ........ 36

B. The Development of the Pebble Project Was the Company's Only Undertaking ..... 37

C. Defendants Were Aware that Anglo American Believed that the Project would be Materially More Costly than the Company had Represented ..... 38

D. During the Class Period, Defendants Used Northern Dynasty Stock as Currency ..... 40

X. CLASS ACTION ALLEGATIONS ..... 43

XI. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ..... 45

XII. NO SAFE HARBOR ..... 46

XIII. COUNTS ..... 47

XIV. PRAYER FOR RELIEF ..... 52

XV. JURY TRIAL DEMANDED ..... 52

Court-appointed Co-Lead Plaintiffs Stephania Nizolek and Cristos Thanos (collectively, "Lead Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Northern Dynasty Minerals Ltd. ("Northern Dynasty" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Northern Dynasty; and (c) review of other publicly available information concerning Northern Dynasty and the Pebble Project (defined herein). Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action against Northern Dynasty and certain of its officers and directors for violations of the federal securities laws. Lead Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of themselves and all similarly situated purchasers of Northern Dynasty securities between September 16, 2013 and February 17, 2017, inclusive (the "Class Period"). Lead Plaintiffs allege that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Northern Dynasty's stock price by misrepresenting material facts concerning Northern Dynasty's principle asset, the Pebble Project, a mineral mining project in Alaska.

2. Northern Dynasty is a publicly-traded Canadian mineral exploration company headquartered in Vancouver, British Columbia. Northern Dynasty is primarily focused on developing the Pebble Project, a copper-gold-molybdenum-

silver mineral project that is located in southwest Alaska, approximately 200 miles (320 kilometers) southwest of the city of Anchorage. The Company has repeatedly described the Pebble Project as a "world class investment opportunity" insofar as it purportedly contains one of the largest undeveloped sources of copper and gold ore. Over $750 million has been committed to developing the Pebble Project; however, the Pebble Project has not been commercially developed to date.

3. Despite being publicly traded, Northern Dynasty remains a small operation managed by a small cadre of key executives including defendants Ronald W. Thiessen ("Thiessen"), the Company's Chief Executive Officer ("CEO"), and Marchand Snyman ("Snyman"), the Company's Chief Financial Officer ("CFO") (collectively, with Northern Dynasty, the "Defendants"). In fact, as of December 31, 2014, Northern Dynasty had only 12 full time employees. The Company historically relied upon seconded employees of a subsidiary of non-party Hunter Dickinson Inc. (defined herein as "HDI"), with which Northern Dynasty shares overlapping executives, to provide geological, corporate development, administrative and management services.

4. In addition, Northern Dynasty historically relied upon its development partners to provide financing and technical services in connection with its pursuit of the Pebble Project. Anglo American plc ("Anglo American" or "Anglo") was Northern Dynasty's 50% co-developer of the Pebble Project. In fact, Anglo American committed over $500 million to developing the Pebble Project and worked alongside Northern Dynasty executives to assess the feasibility of the Pebble Project. Anglo American, however, abandoned the Pebble Project in late 2013 and took an approximate $300 million write-down on its ownership stake. At that time, Northern Dynasty told the investing public that Anglo American's internal decision to walk away from the Pebble Project was not due to a negative view of the

Pebble Project by Anglo American. Defendant Thiessen (Northern Dynasty's CEO and President) told investors at the time "this is not about Pebble, it is about Anglo."

5. Following Anglo American's departure and throughout the Class Period, Northern Dynasty touted the Pebble Project as a phenomenal and lucrative opportunity. At no time did they reveal that they and Anglo American had seen numerous studies that presented a very different picture. During the Class Period, Defendants told investors that the expected capital cost of the Pebble Project would be slightly less than $4.7 billion. At no time did Defendants reveal in Northern Dynasty's Class Period SEC filings or press releases the existence of other reports and assessments, including studies commissioned by Anglo American, projecting costs that were more than double the figure that Defendants were telling the public, or that concerns over these high costs are what drove Anglo American to walk away from the Pebble Project and leave $541 million on the table.

6. On February 14, 2017, Kerrisdale Capital Management LLC ("Kerrisdale"), a hedge fund management company, announced a short position in Northern Dynasty and published a research report that justified its investment thesis (the "Kerrisdale Report" or "Report"). The authors of the Kerrisdale Report stated that they had engaged in discussions with former Pebble Project insiders, including engineers who worked on developing project cost estimates, and reported that Northern Dynasty was aware of cost projections that were materially higher than those previously disclosed to investors. The Company allegedly sought to prevent these analyses from being publicized. In addition, Kerrisdale concluded that, contrary to Defendants' public representations, Anglo American walked away from its more than $500 million investment in the Pebble Project concluding that the economics did not make sense.

7. Anglo American personnel viewed Northern Dynasty's economic analyses as unrealistic and overly optimistic, even speculated that concern for the

company's stock price was pushing Northern Dynasty management to make short-sighted choices. In Anglo's more sober view, Pebble's upfront capital costs would be more than 100% higher than what Northern Dynasty had suggested, while operating costs would be roughly 20% higher. In addition, Kerrisdale reported that despite years of trying, Northern Dynasty affiliated engineers *could not* find scenarios that yielded a net positive value – even if significant regulatory hurdles were not factored into those analyses.

8. The publication of the Kerrisdale Report caused an immediate decline in the price of Northern Dynasty shares. On February 14, 2017, the first day of trading following the publication of the Kerrisdale Report, Northern Dynasty shares fell over 21%, from $3.18 to close at $2.50 per share, on extremely high trading volume of more than 65 million shares (compared to average trading volume of approximately 906,000 shares per day during the Class Period).

9. In the days that followed, Northern Dynasty stock continued to decline, sinking to $2.26 by February 17, 2017 to close the week, as investors digested the full impact of Defendants' material omissions, misleading statements and deliberately reckless acts.

10. On February 17, 2017, after the close of trading, Northern Dynasty published its formal "rebuttal" to the Kerrisdale Report, entitled, "Northern Dynasty Refutes Short Seller Claims," (the "Rebuttal Report"). In its rebuttal, the Company acknowledged the existence of a report that contained a $13 billion cost estimate prepared by Anglo American secondees to the Pebble Project. This "rebuttal" by Defendants therefore supported Kerrisdale's assertions about the reasons for Anglo American's departure from the Project. In addition, Northern Dynasty explained that it commissioned an independent engineering firm to review Anglo American's cost estimate and determined that a $9 billion figure was more appropriate. Even that reduced figure was nearly double the $4.7 billion development cost contained in

the 2011 Preliminary Assessment ("2011 Preliminary Assessment") disclosed to investors during the Class Period.

11. During the next trading day, Northern Dynasty's stock price plummeted more than 26% on unusually heavy trading volume, falling from a close of $2.26 per share on Friday, February 17, 2017, to a close of $1.66 per share on Monday, February 21, 2017, causing millions of dollars in investor losses.

12. The negative stock price reaction to Northern Dynasty's "rebuttal" to the Kerrisdale Report was unsurprising. By admitting that Anglo American had estimated development costs at $13 billion estimate (nearly triple the estimate that Northern Dynasty was providing to the public at the time of Anglo's departure) and acknowledging that its experts believed development costs were close to $9 billion, Northern Dynasty corroborated material aspects of the Kerrisdale Report.

13. During the Class Period, Defendants falsely told investors that Anglo American, its Pebble Project development partner walked away from its more than $500 million investment, and took a $300 million write-down, for reasons that were wholly unrelated to Anglo American's concerns about the costs of developing and operating the mine. As a direct consequence of Defendants non-disclosures and materially misleading disclosures, the price of Northern Dynasty securities were artificially inflated during the Class Period.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in

furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

18. Co-Lead Plaintiff Stephania Nizolek purchased Northern Dynasty common stock during the Class Period, as was detailed in a sworn certification filed previously with the Court, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Co-Lead Plaintiff Cristos Thanos purchased Northern Dynasty common stock during the Class Period, as was detailed in a sworn certification filed previously with the Court, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

20. **Defendant Northern Dynasty, Ltd.** (previously defined as "Northern Dynasty" or the "Company") engages in the exploration and development of mineral properties in the United States. Northern Dynasty's principal property is the Pebble copper gold-molybdenum mineral project located in southwest Alaska (the "Pebble Project"). The Company is incorporated in British Columbia, Canada and its principal executive offices are located at 15th Floor, 1040 West Georgia Street Vancouver, British Columbia, Canada, V6E 4H1 A. Northern Dynasty securities

are traded on NYSE American ("NYSE American") under the ticker symbol "NAK."

21. **Defendant Ronald W. Thiessen ("Thiessen")** has been the Chief Executive Officer ("CEO"), President and a director of the Company throughout the Class Period. Since 1986, Mr. Thiessen has been involved in the acquisition and financing of mining and mineral exploration companies.

22. **Defendant Marchand Snyman ("Snyman")** has been the Chief Financial Officer ("CFO") of the Company throughout the Class Period. Additionally, Snyman was a director of the Company throughout the Class Period until February 24, 2016.

23. Hereinafter, Defendants Thiessen and Snyman will be collectively referred to as the "Individual Defendants." Defendant Northern Dynasty and the Individual Defendants will be collectively referred to as "Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Northern Dynasty's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

C. **Relevant Non-Parties**

24. **Non-Party Hunter Dickinson Inc. ("HDI")** is a privately-owned, Vancouver, Canada-based, diversified, global mining group. HDI provides management and technical services to a diverse portfolio of high-quality and high-growth mineral companies and properties, including Northern Dynasty. Defendant Thiessen serves as HDI's CEO and Director. Together with Chairman of HDI and Northern Dynasty Director, Robert A. Dickinson ("Dickinson"), Thiessen serves on the boards of directors of other publicly traded companies associated with HDI. In addition, several other Northern Dynasty executives hold positions at HDI, including Defendant Snyman, who serves as HDI's Chief Operating Officer ("COO").

25. **Non-Party Hunter Dickinson Services Inc. ("HDSI")**, a subsidiary of HDI, geological, corporate development, administrative and management services to, and incurs third party costs on behalf of, Northern Dynasty at costs negotiated by Northern Dynasty's Board of Directors. For example, the proxy statement that Northern Dynasty filed with the SEC on May 16, 2014 provides specific details concerning the interconnected relationship between HDSI and Northern Dynasty:

> HDSI is a private company which is owned privately by persons some of whom are directors of the Company: Messrs. Dickinson, Cousens, Hallbauer, Thiessen and Snyman. ***HDSI provides geological, corporate development, administrative and management services to, and incurs third party costs on behalf of, the Company and its subsidiaries at annually set rates pursuant to an agreement dated July 2, 2010 (the "Agreement").*** During the year ended December 31, 2013, the Company paid HDSI approximately $4.2 million (2012 – $3.5 million) for services rendered by HDSI and reimbursed HDSI approximately $0.8 million (2012 - $1.1 million) for third party costs incurred by HDSI on the Company's behalf. ***Certain members of the Company's senior management are employed directly by HDSI rather than by Northern Dynasty.***[1]

---

[1] Unless specifically noted, all emphasis is added to original text.

26. **Non-Party Pebble Limited Partnership ("Pebble Partnership" or "PLP")** is the entity through which Northern Dynasty manages its 100% ownership interest in the development of the Pebble Project. At least certain of the Pebble Partnership employees, including the current CEO Thomas Collier, are compensated directly through a subsidiary of Northern Dynasty.

## IV. <u>STATEMENT OF FACTS</u>

### A. <u>Overview of Northern Dynasty and the Fraught History of the Pebble Project</u>

27. Northern Dynasty is a mineral exploration company, incorporated in Canada and Vancouver, British Columbia, Canada. Northern Dynasty is a publicly traded company. The Company's shares trade on the NYSE American Exchange (f/k/a "NYSE MKT") and the Toronto Stock Exchange ("TSX").

28. Historically, Northern Dynasty did not generate any operating revenue. In addition, the Company historically relied upon seconded employees of a subsidiary of non-party HDI, with which Northern Dynasty shares overlapping executives, to provide geological, corporate development, administrative and management services.

29. Northern Dynasty has focused exclusively on developing the Pebble Project, a copper-gold-molybdenum-silver mineral project. As depicted by the following chart, the Pebble Project is located in southwest Alaska, approximately 200 miles (320 kilometers) southwest of the city of Anchorage.




30. The Company's Alaska mineral resource exploration business is operated through an Alaskan registered limited partnership, the Pebble Partnership, in which the Company (since December 2013) owns a 100% interest through subsidiary entities. A brief history of the Pebble Partnership, adopted from the Company's Form 20F for the year ending December 31, 2015, follows. On July 26, 2007, the Company converted a wholly-owned general partnership that held its Pebble Project interests into a limited partnership, the Pebble Partnership, which would be responsible for permitting and developing the mining operations. Anglo American through a wholly-owned affiliate subscribed for 50% of the Pebble Partnership's equity effective July 31, 2007. To maintain its 50% interest in the Pebble Partnership, Anglo American was required to commit staged cash investments into the Pebble Partnership aggregating to $1.5 billion. As described herein, *see* Section IV.B, *infra*, on September 15, 2013, Anglo American gave notice to the Company of its withdrawal from the Pebble Partnership. In December 2013, Northern Dynasty exercised its right to acquire Anglo American's 50% interest and consequently holds a 100% interest in the Pebble Partnership.

31. Over the course of the Pebble Project's development, Northern Dynasty never publicly deviated from its lofty valuation of the project's potential. For example, in a May 2016 corporate presentation, Northern Dynasty called the Pebble Project as world class investment opportunity and ranked it "among the world's greatest stores of mineral [w]ealth."

32. Moreover, it is undisputed that the scale of the Pebble Project is vast. For example, preliminary designs of the Pebble Project, filed by Northern Dynasty with the SEC, called for "an open pit mine that could become two to three miles wide and a mile deep," which "would be one of the largest open-pit mines in the world" and accompanied by "a tailings dam will rise 700 feet high, covering several square miles and able to hold billions of tons of mining waste."[2]

33. Yet, valuable copper and gold ores, if they cannot be extracted in cost-effective manner, are worth no more than gangue. Developing and operating a mine on the scale as vast as the Pebble Project is expensive, even assuming *arguendo* that all federal and state-level regulatory approvals are secured.[3]

---

[2] *See* Transcript, Frontline Documentary: Alaska's Gold, PBS.org, dated July 24, 2012, *available at*: http://www.pbs.org/wgbh/frontline/film/alaska-gold/transcript/.

[3] In addition to the Company's well-publicized difficulties with receiving signoff from the U.S. Environmental Protection Agency (the "EPA"), Northern Dynasty will ultimately need to address persistent local opposition to the mine. *See* T. Sohn, "Alaska's Pebble Mine and the Legend of Trump's Gold," *New Yorker*, dated Mar. 2, 2017, *available at*: https://www.newyorker.com/tech/elements/alaskas-pebble-mine-and-the-legend-of-trumps-gold (Tim Bristol, the executive director of the Alaskan conservation group SalmonState, "Pebble does not have an E.P.A. problem. They have an Alaska problem. It's the development project that Alaskans love to hate."); E. Brehmer, "Walker against Pebble and EPA, suggests 5% agency cuts," Alaska Journal of Commerce, dated Oct. 15, 2014, *available at*: http://www.alaskajournal.com/business-and-finance/2014-10-15/walker-against-pebble-and-epa-suggests-5-agency-cuts#.WbIXnVGGOUm (Alaska Governor Bill Walker remarked, "Based on what I know at this point I'm not in favor of Pebble," while still a political

34. Recognizing that the Company could not shoulder the development costs alone, Northern Dynasty consistently relied upon the expertise and financial support of development partners and corporate investors. For example, multinational corporations such as Mitsubishi Corporation[4] and the mining conglomerate Rio Tinto plc owned significant stakes in Northern Dynasty at various times. More directly, Northern Dynasty, and its executives, worked closely with Anglo American, its 50% joint venture partner since 2007, to develop the Pebble Project. Anglo American committed over $500 million to developing the Pebble Project, as discussed herein.

35. On February 23, 2011, the Company announced the results of the Pebble Project's Preliminary Assessment Report. That report estimated development costs to be $4.7 billion.[5] Even using those assumptions, Northern Dynasty recognized that it *did not* have the financial capability of developing the Pebble Project into a commercial venture due to expected costs. The Company decided to openly market itself as an acquisition target.

36. In a March 10, 2011 article titled the "$6 Billion Pebble: Northern Dynasty Expects a Takeover of its 50% of the World's Largest Undeveloped Deposit," Defendant Thiessen stated: "It's unlikely that Northern Dynasty as a

---

candidate); Obituary, "Remembering Stevens: senator was as a straight-shooter on seafood," *Alaska Journal of Commerce*, dated Aug. 19, 2010, *available at*: http://www.alaskajournal.com/community/2010-08-20/remembering-stevens-senator-was-straight-shooter-seafood#.WbIXhVGGOUl (Former Sen. Ted Stevens: "I am not opposed to mining, but it is the wrong mine for the wrong place.").

[4] Mitsubishi Corporation acquired a 9.1% stake in Northern Dynasty in February 2008 before selling off its shares prior to the Class Period in March 2011.

[5] Northern Dynasty Press Release, "Northern Dynasty Receives Positive Preliminary Assessment Technical Report for Globally Significant Pebble Copper-Gold-Molybdenum Project in Southwest Alaska," dated Feb. 23, 2011, *available at*: http://www.northerndynastyminerals.com/ndm/NewsReleases.asp?ReportID=595724.

separate entity will be there for the development and construction of this project. Pebble's structure has been built around the end result that we would likely be acquired."[6] Robert Dickinson, then Executive Chairman of Northern Dynasty, anticipated receiving "competitive interest in Pebble from a broad range of potential acquirers."[7] Yet, by August 2011, the Company conceded that it had not received a single takeover offer.[8]

### B. Anglo American Abandons the Pebble Project

37. On September 16, 2013, Anglo American announced its decision to walk away from the Pebble Project after investing more than $541 million in development costs. In December 2013, Anglo American also announced that it would take a $300 million write-down on its stake in the Pebble Project.[9]

38. During a quickly assembled September 16, 2013 investor call, Defendant Thiessen explained:

> From NDM standpoint, this means that we will now be back in possession of 100% of the Pebble projects, and the beneficiary of something north of $540 million worth of expenditures by Anglo over the last five years, a tremendous database and one which provides us with the opportunity to completely evaluate this project, and we're in a

---

[6] *See* K. Grace, "$6 Billion Pebble: Northern Dynasty Expects a Takeover of its 50% of the World's Largest Undeveloped Deposit", ResourceClips.com, dated Mar. 10, 2011, *available at*: http://resourceclips.com/wp-content/remote/pub_pdf/the_6_billion_NDM_CA.pdf

[7] A. Jensen, "Northern Dynasty looks to sell Pebble stake," Homer News, dated Apr. 27, 2011, *available at*: http://homernews.com/stories/042711/business_nddl.shtml.

[8] *See* M. Pemberton, "Northern Dynasty puts stake in Pebble prospect up for sale," Alaska Dispatch News, dated Aug. 30, 2011, *available at*: https://www.adn.com/economy/article/northern-dynasty-puts-stake-pebble-prospect-sale/2011/08/30/.

[9] A. Kommenic "Northern Dynasty share price rises 12% as company officially reclaims 100% of Pebble project", Mining.com, dated Dec. 13, 2013, *available at*: http://www.mining.com/with-anglo-officially-out-northern-dynasty-alone-in-pebble-project-49690/.

> position where we are 99% complete on I would say the project description, which is the functional document for permitting purposes.

39. During the same September 16, 2013 call, Thiessen also adopted the position that "this is not about Pebble, it is about Anglo" in its attempt to explain away Anglo American's decision to walk away from its $541 million investment.

40. In fact, contrary to Defendants' statements, Anglo American's decision to abandon the Pebble Project boiled down to simple economics of the mine as a development prospect, as opposed to some financial difficulties that Anglo American was experiencing independent of the Pebble Project. Indeed, Anglo American's underlying operating profits increased from $6.3 billion in 2012 to $6.6 billion during 2013, as disclosed in Anglo American's 2013 annual report. As such, scuttling the Pebble Project was an economic decision made with a view towards Anglo American's long-term development prospects, and not its immediate economic conditions. This fact was confirmed by Mark Cutifani ("Cutifani"), Anglo American's CEO, in the wake of Anglo American's departure in his remarks at a mining conference held in Belo Horizonte, Brazil on September 24, 2013, when he alluded to the recent withdrawal from the Pebble Project (but without naming the Pebble Project specifically): "***Our decision was an economic one*** and not associated with environmental or social issues." This passing reference by Anglo American's CEO at an industry conference in South America would not attract the attention of Northern Dynasty's investors, especially after Thiessen assured them that the withdrawal reflected a problem at Anglo American, and not a problem with the Pebble Project. In addition, this statement was not directly incorporated into SEC filings by Anglo American nor of course Northern Dynasty.

41. More than three years later, the Kerrisdale Report, however, provided detailed accounts of former Anglo American employees and others at the Pebble Project who confirmed that Anglo American's withdrawal in fact was an economic decision. The Kerrisdale Report detailed how Anglo American and Northern

Dynasty officials disagreed on economic analyses concerning development cost, with Northern Dynasty urging that materially lower cost estimates be adopted. Specifically, the Kerrisdale Report detailed how Anglo American and Northern Dynasty officials had major disagreements over expected developments costs with the former estimating costs up to $13 billion and the latter insisting on costs of less than $4.7 billion. *See, generally,* Section IV.C, *infra*.

42. The fact that Anglo American left the Pebble Project (and the more than $500 million it had invested therein) due to concerns about the Project's viability is further confirmed by Northern Dynasty's February 17, 2017, "rebuttal" to the Kerrisdale Report. Northern Dynasty admitted that Anglo American had estimated development costs for the Project at $13 billion – nearly triple the $4.69 billion estimate that Northern Dynasty purported to be using at the time. In the immediate of wake Anglo American's exit from the Pebble Project, Northern Dynasty sought to spin Anglo American's departure as a net benefit.

43. Throughout the Class Period, the true reasons behind Anglo American's departure from the Pebble Project remained unknown to Northern Dynasty investors.

**C. Kerrisdale Releases Report Undermining Northern Dynasty's False Narrative**

44. Following President Trump's 2016 election victory, Defendants seized on the narrative that Northern Dynasty's regulatory woes, which were constant under the Obama administration's EPA, would fade away under the incoming Trump's administration EPA. For example, Defendant Thiessen explained to investors in January 2017 that the Trump administration had "a desire to permit Pebble" and that lingering EPA issues would be resolved "within 100 days."[10] In an

[10] *See* N. Pearson, "Northern Dynasty Says It Has Trump Backing, Seeking New Partner," Bloomberg, dated Jan. 23, 2017, *available at*: https://www.bloomberg.

interview with *Mining News*, Thiessen explained that "[t]he stars that were previously askew, they seem to be lining up" and Pebble Project CEO Collier acknowledged the surprising result and called the Trump victory a "game changer."[11]

45. In response, the stock price of Northern Dynasty surged. Furthermore, the Company capitalized on renewed investor optimism by raising over $49 million through a January 2017 secondary offering of Northern Dynasty stock that marketed the Company's plan to develop the Pebble Project during the first four years of the Trump administration. The *New Yorker* subsequently captured the unbridled investor optimism and how the share price quadrupled in value since the election.[12]

46. On February 14, 2017, Kerrisdale, a hedge fund specializing in short-sale positions, published a research report, which was titled "Northern Dynasty Minerals Ltd. (NAK): Cu at Zero", setting forth a short investment thesis.[13] As indicated by the report's title, Kerrisdale maintained that Northern Dynasty was "worthless" as the economic realities were the Pebble Project's Achilles' heel, and not regulatory concerns.[14] This analysis ran directly contrary to popular sentiment

---

com/news/articles/2017-01-23/northern-dynasty-says-it-has-trump-backing-seeking-new-partner.

[11] S. Lasley, "Pebble stars align. Trump, expected EPA treaty, improved markets bode well for Alaska project," *Mining News*, dated Feb. 5, 2017, *available at*: http://www.petroleumnews.com/pntruncate/116537882.shtml.

[12] *See* T. Sohn, "Alaska's Pebble Mine and the Legend of Trump's Gold," *New Yorker*, dated Mar. 2, 2017, *available at*: https://www.newyorker.com /tech/elements/alaskas-pebble-mine-and-the-legend-of-trumps-gold.

[13] *See* Kerrisdale, "Northern Dynasty Minerals Ltd. (NAK): Cu at Zero", dated Feb. 14, 2017, *available at*: https://www.kerrisdalecap.com/wp-content/uploads/2017 /02/Northern-Dynasty-Minerals-NAK.pdf.

[14] "Cu" is a reference to the abbreviation for Copper on the periodic table of elements.

and Defendants' endorsed narrative of growth stemming from a looser regulatory approval process. Kerrisdale's conclusion is excerpted below:

> ***Northern Dynasty has skillfully exploited the Trump narrative to reignite enthusiasm for a company that the market had left for dead. But "telling a good story" is all Northern Dynasty has ever been good at.*** It's not just some stroke of bad luck that everyone who has touched the Pebble deposit, from Teck to Mitsubishi to Rio Tinto to Anglo American to Northern Dynasty itself, has given up on it or tried to; the project is fundamentally and irretrievably flawed, requiring far too much expensive infrastructure to generate an adequate return on investment mining low-grade ore. ***Our discussions with technical experts directly involved in the project indicated that Northern Dynasty itself has long been aware of these fatal flaws but opted to paper them over rather than fess up. Nonetheless, Northern Dynasty can't keep the charade going forever; without a deep-pocketed partner, it will ultimately perish.***

47. In addition, the Kerrisdale Report provided detailed insider accounts of the stark economic realities that Northern Dynasty would have to confront, even assuming *arguendo* that the Pebble Project received all necessary regulatory approvals. Specifically, Kerrisdale described how the economic cost of developing and operating the Pebble Project was what drove away prior development partners and previously prompted Northern Dynasty to market its own interest for sale prior to the Class Period. In particular, the Report detailed how disagreement over expected developments costs, with Anglo American estimating costs of up to $13 billion and Northern Dynasty asserting costs of less than $4.7 billion, underpinned the economic concerns that prompted Anglo American to walk away from the Pebble Project. Kerrisdale noted that Anglo personnel "even speculat[ed] that concern for the company's stock price was pushing Northern Dynasty management to make short-sighted choices."

48. Kerrisdale relied upon confidential sources who described how Northern Dynasty sought to prevent the release of feasibility studies that contradicted Northern Dynasty's own economic feasibility study contained in the 2011 Preliminary Assessment. Based on its discussions with confidential sources,

Kerrisdale concluded that economic concerns were what ultimately drove Anglo American away from the Pebble Project.

> ***Overall, the work of Anglo and third-party engineers indicated that the likely upfront capital cost of the Pebble project would be roughly $11 to $13 billion – more than double the $4.7 billion figure used in the Northern Dynasty–commissioned 2011 preliminary assessment.*** While Northern Dynasty's estimated operating costs were, in Anglo's view, more realistic, they were still roughly 20% too low. Despite years of effort, engineers not directly affiliated with Northern Dynasty just couldn't find a reasonable scenario where building the Pebble mine yielded a positive net present value – even using standard hurdle rates that did not account for the unusually severe regulatory risk that the project has long suffered from, and even using assumed metal prices higher than those that prevail today. Thus, when Anglo upper management began to pare back its worst projects, Pebble was an easy target. ***The notion that Pebble couldn't generate an adequate return on investment in any realistic scenario is the only thing that makes sense of Anglo's radical actions: walking away from almost $600 million of sunk costs without making any effort to restructure its deal with Northern Dynasty, well before the EPA initiated its veto.***

49. Kerrisdale reported that one former Anglo American engineer associated with the Pebble Project explained the wide gap between Northern Dynasty and Anglo American's project estimates by stating:

> ***If we [Anglo American] think 13 [billion dollars of upfront capital costs], and the other guys are saying 4, if we're on the far side, you know, you could turn that down to perhaps 8 to 10, but to turn it down to 4 is just getting to the art of the ridiculous.*** It's just too close to the bone. I mean, you'll battle to operate a plant like that – especially in a remote environment where weather conditions are not easy to deal with in the best stretch.…***We were always fighting them on the basis that they thought this could be easier.… I mean, we live in the real world.…The reality is, is that practical? I don't think so.***

50. That Anglo American ultimately determined that the Pebble Project was not economically viable was foreseeable for Northern Dynasty based on disputes over project development assumptions along the way. Kerrisdale reported that tensions emerged between Northern Dynasty and Anglo American as specific cost assumptions were developed and "Northern Dynasty representatives repeatedly pressured Anglo American and third-party engineers to slash their estimates of how

high these infrastructure costs would run." Recounting the narrative of one engineer describing discussions over the mine's proposed power plant, Kerrisdale reported:

> ***Obviously HDI Mining [i.e. Hunter Dickinson Inc., Northern Dynasty's management company] didn't like those figures, and they started taking the team to task about it….They were trying to sell a positive story, while Anglo erred rather toward a conservative side of things. … It's lots of challenge.*** You have to bring your own power. You've got to bring your own food, your own buildings. You've got to bring everything yourself – and then, to think 240 megawatts would do it?…I've got tangible figures, and I would like people to come and argue with me, because maybe there's something that I didn't know. ***And they [Northern Dynasty] just came in there with, in my view, a hidden agenda of telling a good story….Some people always want to tell a good story to get their bonuses.***

51. The same engineer went on to explain to Kerrisdale that "[c]ost was everything, . . . HDI Mining was blowing down the project team members' neck to reduce costs, reduce costs. . . . They always tried to cut back on capital." The engineer concerns were confirmed by another source which told Kerrisdale "that Northern Dynasty lowballed the realistic power requirements of the project, recalling that, whenever the company saw backup power in a mine design, 'they would cut that down to a minimum to begin with – and then some.'"

52. The tensions between Anglo American and Northern Dynasty reached a breaking point prior to Anglo American existing the project. Kerrisdale asserted that Northern Dynasty actively sought to avoid receiving cost analyses that contradicted its 2011 economic analysis. This claim was rooted in the account of one source (and confirmed by a second source) who told Kerrisdale:

> ***What's interesting is, as we were about to issue our PFS [pre-feasibility study] that we came up [with] in 2012 or so, they [Northern Dynasty] stopped us finishing that PFS. We weren't supposed to issue the report, you see. We were coming up with 13 billion in capital.***

53. Kerrisdale attributed this stop work order on Northern Dynasty's desire to remain willfully ignorant of any official conclusion that contradicted prior analyses: "Based on our discussions, ***Anglo personnel believed that Northern Dynasty wanted to avoid disclosure requirements under Canadian securities law.***

In other words, according to people directly involved in the Pebble project, Northern Dynasty knew that the Anglo analysis had found that Pebble was worse than worthless but did everything it could to keep that information out of shareholders' hands."

54. As discussed above and herein (*see* Sections IV.B and IV.C), on February 17, 2017, Northern Dynasty published a formal response to the Kerrisdale Report following the close of trading. The Rebuttal Report, however, actually corroborated critical aspects of the Kerrisdale Report. Namely, Northern Dynasty disclosed that (a) Anglo American prior to departing the Pebble Project had prepared a report that estimated costs at $13 billion – nearly triple Northern Dynasty's estimates at the time, and (b) even Northern Dynasty's own independent experts estimated costs at $9 billion.

55. During the Class Period, Defendants did not disclose that Anglo American harbored serious doubts concerning the economic feasibility of the mine based on actual cost projections developed by Anglo American employees and reviewed by independent engineers engaged by Northern Dynasty that were more than double Northern Dynasty's cost estimates, and that concerns over the feasibility of the Pebble Project drove Anglo American to leave the Project in late 2013. For example, according to the Kerrisdale Report, Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low. Defendants instead sought to convince investors that another large, multi-national mining company willingly walked away from a more than $500 million investment due to extenuating circumstances that were unrelated to the Pebble Project's near-term viability as a commercial venture. Indeed, during early 2017, Defendant Thiessen seemingly recognized that other development partners were prone to reaching the same conclusions as Northern Dynasty's former partners and suggested, ***"We may be best served to take a more modest approach"*** and that the

mine design that ultimately goes to permitting may be half the size.[15] Still, these economic concerns *were not* adequately disclosed to investors until the Kerrisdale Report was published.

56. Lingering questions concerning the development of the Pebble Project remain unanswered. In late 2017, Northern Dynasty adopted a more modest mine footprint and embarked on the preliminary stages of the permitting process after more than a decade of delay. Likewise, in December 2017, the Company also announced negotiations to enter into a multi-year development partnership with the mining company First Quantum. The arrangement would have given a unit of Toronto-based First Quantum an option to earn a 50% interest for $1.5 billion in Pebble in return for $150 million paid over four years to fund permitting for the project, one of the richest copper-gold deposits ever discovered. However, on May 25, 2018, Northern Dynasty disclosed that negotiations with First Quantum fell apart. And, Northern Dynasty remains without the development partner that it has been looking for since Anglo American withdrew from the Pebble Project in September 2013.

## V. <u>DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD</u>

57. Throughout the Class Period and as detailed in the Kerrisdale Report and confirmed by the Company's own disclosures contained in its Rebuttal Report, Defendants were informed by Anglo American and third-party engineers that the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011 and that Anglo American had

---

[15] *See* S. Lasley, "Pebble stars align - Trump, expected EPA treaty, improved markets bode well for Alaska project", *Mining News*, dated Feb. 5, 2017, *available at*: http://www.petroleumnews.com/pntruncate/116537882.shtml.

withdrawn from the project since it had determined that the Pebble Project was not economically viable. Additionally, according to the Kerrisdale Report, Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

58. In fact, Northern Dynasty acknowledged in its Rebuttal Report that it was aware of a $13 billion estimate in a study prepared by Anglo American employees. Northern Dynasty also acknowledged that it had commissioned independent third-party engineers to review the $13 billion study prepared by Anglo American employees. Those engineers determined that development costs likely to be approximately double the $4.7 billion figure contained in the 2011 Preliminary Assessment. That information was not disclosed to investors during the Class Period. However, such information would have provided the context to evaluate (i) the economic factors underpinning Anglo American's withdrawal from the Pebble Project and (ii) the actual economic costs of developing the Pebble Project. As such, Defendants' admission at the end of the Class Period confirms they failed to disclose these material facts to investors and the marketplace.

### A. <u>Defendants' False and Misleading Statements Disseminated to the Public on September 16, 2013</u>

59. The Class Period starts on September 16, 2013. On that date, the Company issued a press release entitled, "Anglo American Withdraws from Pebble Project." Therein, the Company, in relevant part, stated:

> Northern Dynasty Minerals Ltd. (TSX: NDM; NYSE MKT: NAK) ("Northern Dynasty" or the "Company") reports that Anglo American (US) Pebble LLC ("AA Pebble"), a wholly owned US subsidiary of Anglo American plc ("Anglo American"), has given notice under the Pebble limited partnership agreement that it is withdrawing from the Pebble copper project in Alaska.
>
> ***
>
> Northern Dynasty CEO Ron Thiessen commented "Northern Dynasty will again own 100% of one of the world's most important copper &

> gold resources and will have the benefit of $541 million worth of expenditures, which opens the door to a number of exciting possibilities for Northern Dynasty and its shareholders and the Pebble Project and its stakeholders. Northern Dynasty and the Pebble Partnership have both the expertise and resources necessary to advance the Pebble Project."

60. On September 16, 2013, the Company held a conference call with analysts and investors to discuss Anglo American's withdrawal from the Pebble Project. Therein, Defendant Thiessen, in relevant part, stated:

> I think going forward, I think in terms of Anglo's decision, Mark Cutifani's quote that ***this is not about Pebble, it is about Anglo***, best defines to the best I can gather Anglo's position that they had other extenuating circumstances, which just in the unfortunate circumstance for them, let them to this position ultimately.
>
> From NDM standpoint, this means that we will now be back in possession of 100% of the Pebble projects, and the beneficiary of something north of $540 million worth of expenditures by Anglo over the last five years, a tremendous database and one which provides us with the opportunity to completely evaluate this project, and we're in a position where we are 99% complete on I would say the project description, which is the functional document for permitting purposes.
>
> ***
>
> Some questions that people are asking is what's going to happen vis-à-vis the technical capabilities of Pebble Limited Partnership, given the fact that all of this money has been spent by Anglo and they have seconded some engineers into the project, I mean we are functionally done with all the heavy lifting and what remains really for the project is the permitting process, so I think moving forward the partnership itself, while there is likely to be downsizing in capacity, we won't miss any of the technical capabilities that will be withdrawn by Anglo when they leave.

61. Additionally, on this same conference call, an analyst asked "the curious question is why, why Anglo would withdrawal if [the project description] was [] close to 99% complete?" In response, Defendant Thiessen, in relevant part, stated:

> I mean the reality was last week, there were two groups of partner representatives Northern Dynasty and Anglo up in Anchorage going through what I call the penultimate draft of the project description and they reported back generally that it's in very good shape and even from the PLP staff, I heard that – that the amount of partner involvement,

> recommendation, suggestion was greatly appreciated and so, I think it's very close to a finished product.
>
> ***
>
> ***And I think, the reason they decided to withdraw [sic] was in terms of the timing, again I go back, I think, it simply had to do with their budgeting and cash flow cycling*** that typically we would try and get programs and budgets in a preliminary state done for them for October, November for the ensuing year, many times we'll get – actually come to final determinations but we were generally within a plus/minus 20% by fall for the ensuing year.

62. As detailed in the Kerrisdale Report (*see* Section IV.C, *supra*), and confirmed in large part by Northern Dynasty's February 2017 rebuttal, these statements concerning Anglo American's withdrawal from the Pebble Project and the purported rationale for this withdrawal were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) Anglo American had projected the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

**B. <u>Defendants' False and Misleading Statements Disseminated to the Public on September 23, 2013</u>**

63. On September 23, 2013, Northern Dynasty gave a presentation with slideshow at the Denver Gold Forum. In this slideshow, Northern Dynasty represented that the 2011 Preliminary Assessment determined the capital cost of the Pebble Project would be $4.695 billion.

64. The presentation, however, was false and misleading since the Company failed to disclose that Anglo American and third-party engineers had

informed Defendants that the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011, the Pebble Partnership's former CEO had estimate the costs to be in the $7 to $8 billion range, and that the Company actively sought to avoid receiving cost analyses that contradicted its 2011 Preliminary Assessment.

### C. **<u>Defendants' False and Misleading Statements Disseminated to the Public on December 13, 2013</u>**

65. On December 13, 2013, the Company issued a press release entitled, "Anglo American completes withdrawal from the Pebble Limited Partnership." Therein, the Company, in relevant part, stated:

> Northern Dynasty Minerals Ltd. (TSX: NDM; NYSE MKT: NAK) ("Northern Dynasty" or the "Company") announces that it has exercised its right to acquire Anglo American (US) Pebble LLC's ("Anglo American") interest in the Pebble Limited Partnership ("Pebble Partnership" or "PLP"). Northern Dynasty has now re-acquired 100% ownership and control of the Pebble Partnership. All Anglo American representatives have resigned from the Pebble Mines Corporation Board of Directors.
>
> "During the course of the last six years and at a cost of US$556 million (as of September 30, 2013), substantial progress has been made toward our goal of permitting, constructing and operating a world-class, modern and environmentally responsible mine at Pebble that will co-exist with the fisheries resources of southwest Alaska," said Northern Dynasty President & CEO Ronald Thiessen.
>
> Thiessen said Pebble's engineering design, environmental science and regulatory planning are now sufficiently advanced that PLP will be in a position to trigger federal and state permitting under the National Environmental Policy Act (NEPA) in the first quarter of 2014. He added that Northern Dynasty's current focus is to consolidate all of the technical data, engineering work and permitting documentation related to Pebble into a data room, with the goal of qualifying and securing a new partner in 2014. A final decision on permit filing will be made in 2014, by the Northern Dynasty Board.

> "Our primary focus is to select the right partner for Northern Dynasty and the right investor for Alaska, a company with sufficient financial resources and technical capabilities, working experience in the United States and a shared commitment to environmentally sound and socially responsible development. We have little doubt that Pebble will attract major mining company interest in the months ahead."

66. As detailed in the Kerrisdale Report (*see* Section IV.C, *supra*) and confirmed in large part by, *inter alia*, Northern Dynasty's February 2017 rebuttal, these statements concerning Anglo American's withdrawal from the Pebble Project were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project since it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

### D. Defendants' False and Misleading Statements Disseminated to the Public on March 27, 2014

67. On March 27, 2014, Northern Dynasty filed its Annual Report with the SEC on Form 40-F for its 2013 fiscal year. The Company's Form 40-F was signed by Defendant Thiessen. Therein, the Company, in relevant part, stated that additional engineering, environmental and socioeconomic studies and data collection had not obviated its 2011 Preliminary Assessment:

> ***In February 2011, Northern Dynasty announced the results of an independent Preliminary Assessment ("2011 PA") of the Pebble Project by Wardrop, a Tetra Tech Company.*** The 2011 PA analyzed the economics of three successive mine development models comprising 25, 45 and 78 years of open pit mining each at a nominal processing rate of 200,000 tons per day. The results of the 2011 PA indicated the potential for positive returns on invested capital in a mine.

> The phase of engineering work which began in 2011 has included additional analysis of various mine and process plant designs, and alternative associated infrastructure options, along with the study of potential designs for a variety of potential transportation infrastructure and power supply options.
>
> ***Although additional engineering, environmental and socioeconomic studies and data collection programs designed to advance a planned prefeasibility study for the Pebble Project continued from 2011 through early 2013, this work was not sufficiently comprehensive or material to obviate the 2011 PA analyses and conclusions. However, since the withdrawal of Anglo American from the Pebble Partnership in late 2013 and in light of more recent stakeholder and regulatory feedback, Northern Dynasty has initiated a comprehensive review of previous analyses of the Pebble project, including the 2011 PA and various project components.*** Current studies of the Pebble project investigate new infrastructure plans as well as lower throughput rates in a revised project development concept. As well, the cost and revenue inputs require complete updating given the nearly 4 years which have passed since the 2011 PA work was done. For these reasons, any project at Pebble which is ultimately put forward for permitting will almost certainly be different from the economic assessment model examined in the 2011 PA. Therefore the conclusions in the 2011 PA study have very limited going-forward relevance at this time and, accordingly, its conclusions have not been repeated in this AIF. There can be no assurances given by Northern Dynasty that the economics of the new alternative mine models being assessed will demonstrate economics similar to those projected in the 2011 PA.

68. As detailed in the Kerrisdale Report (*see* Section IV.C, *supra*), these statements were materially misleading when made because Defendants failed to disclose that Northern Dynasty was not simply reassessing the expected costs in a vacuum, such that the new assessment might easily yield a cost figure equal to or close to the $4.69 billion figure from the 2011 Preliminary Assessment. Rather, Defendants were aware of, but did not disclose, numerous cost estimates that were materially higher than the $4.69 billion figure, including, *inter alia*, Anglo American's $13 billion estimate, Northern Dynasty's own $9 billion estimate, and the $7-$8 billion view held by Shivley, the Pebble Project's former CEO (*see* ¶106, *infra*).

### E. Defendants' False and Misleading Statements Disseminated to the Public on May 15, 2015

69. On May 15, 2015, Northern Dynasty filed its Annual Report with the SEC on Form 20-F for its 2014 fiscal year. The Company's Form 20-F was signed by Defendant Snyman. Therein, the Company, in relevant part, stated that:

> Until December 10, 2013, Northern Dynasty Partnership ("Northern Dynasty") and Anglo American US (Pebble) LLC. ("Anglo"), wholly-owned US affiliates of Northern Dynasty Minerals Ltd. and Anglo American plc. respectively, had equal rights in the Pebble Partnership as the limited partners, and each owned 50% of the outstanding shares of the general partner, Pebble Mines Corp. To maintain its 50% interest in the Pebble Partnership, Anglo was required to make staged cash investments into the Pebble Partnership aggregating to $1.5 billion (described below). On September 15, 2013, Anglo gave notice to Northern Dynasty of its withdrawal from the Pebble Partnership. On December 10, 2013, Northern Dynasty exercised its right to acquire Anglo's 50% interest and consequently holds a 100% interest in the Pebble Partnership and in the Pebble Partnership's general partner, Pebble Mines Corp. (which administers the Pebble Project). Anglo contributed $573.2 million (December 31, 2012 - $504.2 million) to the Pebble Partnership as of December 10, 2013.

70. As detailed in the Kerrisdale Report (*see* Section IV.C, *supra*) and confirmed in large part by, *inter alia*, Northern Dynasty's February 2017 rebuttal, these statements concerning Anglo American's withdrawal from the Pebble Project were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project because it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

**F. <u>Defendants' False and Misleading Statements Disseminated to the Public on May 2, 2016</u>**

71. On May 2, 2016, Northern Dynasty filed its Annual Report with the SEC on Form 20-F for its 2015 fiscal year. The Company's Form 20-F was signed by Defendant Snyman. Therein, the Company, in relevant part, stated that:

> Until December 10, 2013, Northern Dynasty Partnership ("Northern Dynasty") and Anglo American US (Pebble) LLC. ("Anglo"), wholly-owned US affiliates of Northern Dynasty Minerals Ltd. and Anglo American plc. respectively, had equal rights in the Pebble Partnership as the limited partners, and each owned 50% of the outstanding shares of the general partner, Pebble Mines Corp. To maintain its 50% interest in the Pebble Partnership, Anglo was required to make staged cash investments into the Pebble Partnership aggregating to $1.5 billion (described below). On September 15, 2013, Anglo gave notice to Northern Dynasty of its withdrawal from the Pebble Partnership. On December 10, 2013, Northern Dynasty exercised its right to acquire Anglo's 50% interest and consequently holds a 100% interest in the Pebble Partnership and in the Pebble Partnership's general partner, Pebble Mines Corp. (which administers the Pebble Project). Anglo contributed $573.2 million to the Pebble Partnership as of December 10, 2013.

72. As detailed in the Kerrisdale Report (*see* Section IV.C, *supra*) and confirmed in large part by, *inter alia*, Northern Dynasty's February 2017 rebuttal, these statements concerning Anglo American's withdrawal from the Pebble Project were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Anglo American and third-party engineers had informed Defendants that: (1) the upfront capital cost for the Pebble Project would be more than double the amount that Northern Dynasty had estimated in 2011; (2) Anglo American had withdrawn from the project because it had determined that the Pebble Project was not economically viable; and (3) Anglo American believed that Northern Dynasty's estimated operating costs were roughly 20% too low.

**VI. <u>DISCLOSURES AT THE END OF THE CLASS PERIOD</u>**

73. On February 14, 2017, Kerrisdale issued a press release at 9:30 a.m. Eastern announcing the publication of its report entitled "Northern Dynasty

Minerals Ltd. (NAK): Cu at Zero." As discussed above, *see* Section IV.C, *supra*, Kerrisdale determined that, contrary to Northern Dynasty's repeated suggestions otherwise, the Pebble Project was not commercially viable, Anglo American had estimated upfront costs of $13 billion, more than triple Northern Dynasty's estimate, Anglo American withdrew from the Pebble Project following repeated disagreements with Northern Dynasty concerning cost estimates, and Anglo American's decision to walk away from its $540 million investment in the Pebble Project was motivated by a desire to avoid throwing good money after bad.

74. Upon recognizing that investors immediately seized on the Kerrisdale Report, Northern Dynasty disclaimed the accuracy of the Kerrisdale Report within hours of its release. In fact, Northern Dynasty issued a preliminary response prior to the close of trading and pledged to explain away Kerrisdale's "short and distort campaign" in the coming days. The Company's response did not allay investor concerns. On February 14, 2017, Northern Dynasty shares lost over 21% of their value − on extremely high trading volume of more than 65 million shares, falling from $3.18 per share on February 13, 2017 to close at $2.50 per share on February 14, 2017. Moreover, the February 14, 2017 intra-day low was $1.92 per share.

75. On February 17, 2017, Northern Dynasty released its formal response to the Kerrisdale Report following the close of trading. In its response, Northern Dynasty argued that the report was premised upon misstatements, inaccuracies and "anonymous sources." However, Northern Dynasty's response actually confirmed key assertions of the Kerrisdale Report concerning the Pebble Project's viability and Anglo American's perception of that viability.

76. Specifically, Northern Dynasty admitted that a $13 billion cost estimate prepared by Anglo American did exist. In fact, Northern Dynasty disclosed that it commissioned a review of a preliminary draft $13 billion mine planning scenario by an independent engineering firm, which concluded that projected costs were $9

billion, which was nearly double the $4.69 billion figure that Northern Dynasty publicly touted.

77. Northern Dynasty's admissions provided critical context missing from the Company's prior disclosures concerning Anglo American's decision to withdraw from the Pebble Project.

78. Northern Dynasty's formal response *did not* arrest the stock price decline. On the following trading day, February 21, 2017, Northern Dynasty shares fell to $1.66, down from $2.26 on February 17, 2017, a single day decline of 26.55%, again on unusually high trading volume. The stock price reaction suggests that Northern Dynasty's rebuttal did not convince investors that the Kerrisdale Report was inaccurate.[16]

## VII. MATERIALITY

79. Following the publication of the Kerrisdale Report, investor confidence in Northern Dynasty was shattered and an immediate decline in the price of Northern Dynasty shares ensued. On the first day of trading following publication of the Kerrisdale Report, Northern Dynasty shares lost over 21% of their value − on extremely high trading volume of more than 65 million shares. In addition, on February 21, 2017, the first trading day after the Company disclosed information in its February 17, 2017 "rebuttal" to the Kerrisdale Report that

---

[16] Critically, Sahm Adragni, founder of Kerrisdale, reaffirmed his firm's short thesis following Northern Dynasty's strident rebuttal. In a *New Yorker* article published after Northern Dynasty released its official response, Adragni remarked, "The more we dug into it, the more excited we got, because it seemed like this whole thing was just smoke and mirrors, . . . I don't think we've ever received this much praise on a report." *See* T. Sohn, "Alaska's Pebble Mine and the Legend of Trump's Gold," *New Yorker*, dated Mar. 2, 2017, *available at*: https://www.newyorker.com/tech/elements/alaskas-pebble-mine-and-the-legend-of-trumps-gold.

appeared to confirm aspects of that Report, Northern Dynasty shares lost over 26% of their value − on extremely high trading volume of more than 33 million shares.

80. These sharp and immediate market reactions are an extremely practical and clear indicator of materiality. More specifically, the price reactions demonstrate the impact of the publication of the Kerrisdale Report, the Company's subsequent admissions and the preceding materially false and misleading public statements and omissions, which were corrected by the report, had on the market's assessment of the value of Northern Dynasty's stock.

## VIII. LOSS CAUSATION

81. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Northern Dynasty common stock and operated as a fraud or deceit on Class Period purchasers of Northern Dynasty common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Northern Dynasty common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

82. As a result of their purchases of Northern Dynasty common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Northern Dynasty common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $3.36 share on February 10, 2017.

83. The truth was revealed in February 2017. First, on February 14, 2017, as alleged above, Kerrisdale published a research report which described why Defendants' Class Period representations concerning the commercial viability of the Pebble Project and the reasons for Anglo American's abandonment of that Project

were materially false and/or misleading. Following the February 14, 2017 publication of the Kerrisdale Report, Northern Dynasty's stock price plummeted more than 21% on unusually heavy trading volume, falling from a close of $3.18 per share on February 13, 2017, to a close of $2.50 per share on February 14, 2017, causing millions of dollars in investor losses.

84. In the days that followed, Northern Dynasty stock continued to decline, sinking to $2.26 by February 17, 2017 to close the week.

85. Second, following the close of trading on February 17, 2017, Northern Dynasty issued a formal response to the Kerrisdale Report. As discussed above, the "rebuttal" report confirmed key aspects of the Kerrisdale Report, such as the existence of a $13 billion capital cost estimate created by Anglo American, and the fact that even the review commissioned by Northern Dynasty, put the estimate at $9 billion (nearly double the last estimate that Northern Dynasty had shared with the investing public). Accordingly, shareholders seemingly treated Northern Dynasty's "rebuttal" as an admission that corroborated the Kerrisdale Report's narrative. Northern Dynasty's stock price plummeted more than 26% on unusually heavy trading volume, falling from a close of $2.26 per share on Friday, February 17, 2017, to a close of $1.66 per share on Monday, February 21, 2017, causing millions of dollars in investor losses.

86. The market's negative reaction to the February 14 and 17, 2017 disclosures is demonstrated by the following chart:




87. The timing and magnitude of Northern Dynasty's stock price decline between February 13, 2017 and February 21, 2017 negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

88. For example, in its Class Period investor presentations, Northern Dynasty frequently compared its stock price performance to that of the S&P/TSX Composite Materials Sector Index. After the truth became known to the market on February 14, 2017, shares of Northern Dynasty fell more than 21% from the February 13, 2017 closing price. By way of contrast, the price of the S&P/TSX Composite Materials Sector Index fell less than 1% on the same day. After Northern Dynasty's Rebuttal Report disclosed information that appeared to corroborate aspects of the Kerrisdale Report, shares of Northern Dynasty fell by more than 26% from the February 17, 2017 closing price. In total, from the close of trading on February 13, 2017 to February 21, 2017, inclusive, shares of Northern

Dynasty decline by 47.80% whereas the price of the S&P/TSX Composite Materials Sector Index declined by only 1.83%.

89. The price of Northern Dynasty shares continued to decline in subsequent weeks and closed as low as $1.08 on March 14, 2017.

90. By concealing the adverse facts detailed above from investors, Defendants presented a misleading picture of Northern Dynasty's business and future financial prospects. When the truth about the Company was revealed to the market following the release of the Kerrisdale Report, and the Company's subsequent confirmations thereof, the price of Northern Dynasty common stock fell significantly. The declines in the price of Northern Dynasty common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who had purchased Northern Dynasty common stock during the Class Period.

91. In addition, analysts and investors directly attributed this price decline to the Kerrisdale Report, which corrected Defendants' prior false and misleading Class Period statements. The declines in the price of Northern Dynasty common stock after the corrective disclosures (*see* ¶¶83-88, *supra*), came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.

92. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Northern Dynasty common stock and the subsequent significant declines in the value of Northern Dynasty common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

93. Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the true costs and feasibility of the Pebble Project, and Anglo American's rationale for abandoning the project; (b) their intentional issuance of

materially false or misleading statements regarding the true costs and feasibility of the Pebble Project, and Anglo American's rationale for abandoning the project; and/or (c) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

94. The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiffs and the Class.

### A. **Northern Dynasty Was a Small Company**

95. Northern Dynasty is an extremely small company. For example, at the start of the Class Period, the Company only had about "70 or so direct employees."[17] Soon thereafter, the number of Northern Dynasty employees drastically shrank. By December 31, 2014, the Company and its subsidiaries had only 12 full time employees according to the Company's 2014 annual report. For a company with so few employees during the Class Period, it is simply implausible that senior management did not see all studies completed by, or provided to, the Company concerning the costs and feasibility of the Pebble Project, and was not aware of the fact that Anglo American, Northern Dynasty's 50% partner in this venture, and the Pebble Partnership's former CEO had arrived at cost estimates that were materially higher than the estimate that Northern Dynasty was telling the investing public at

[17] L. Demer, "Without monied partner, Pebble cuts staff, ends contracts," *Anchorage Daily News*, dated Oct. 7, 2013, *available at*: https://www.adn.com/alaska-news/article/without-monied-partner-pebble-cuts-staff-ends-contracts/2013/10/07/

the time.

**B. The Development of the Pebble Project Was the Company's Only Undertaking**

96. Northern Dynasty's sole corporate purpose is to attempt develop the Pebble Project. As the Company's 2015 Annual Report explained:

> **…the Pebble Project is Northern Dynasty's principal mineral property interest…**
>
> ***
>
> The Pebble Project is, through the Pebble Partnership, Northern Dynasty's principal mineral property interest. ***Northern Dynasty's principal business objective is to carry out further exploration and related activities to establish whether the Pebble Project possesses commercially viable deposits of ore.*** If Northern Dynasty is not successful in its plan of operations, Northern Dynasty may have to seek a new mineral property to explore or acquire an interest in a new mineral property or project.

97. Essentially, Defendants' primary jobs were to oversee and manage exploration and related activities of the Pebble Project. It is unfathomable that Defendants were not aware of the cost estimates provided by its primary financial partner, Anglo American, that had spent $541 million on the project and was committed to spend almost $1 billion more or that Anglo American had withdrawn from the project because it had determined that the Pebble Project was not economically viable. Moreover, as described in the Kerrisdale Report, Northern Dynasty actively sought to avoid receiving cost analyses so that it could public maintain the validity of its 2011 cost estimate. Only high ranking executives, such as the Individual Defendants, had the authority to prevent the issuance of the reports that had higher cost estimates or make the determination that these reports "was not sufficiently comprehensive or material to obviate the 2011 PA analyses and conclusions."

98. In the event that the Company's CEOs and CFOs were unaware of these facts, this ignorance constitutes acting in such a deliberately reckless manner

as to constitute fraud and deceit upon Lead Plaintiff and other Class members. However, the most reasonable inference from the fact that the Pebble Project development was the Company's primary endeavor is that the Individual Defendants were aware that both Anglo American and the Pebble Project's own former CEO believed that the project would be substantially more expensive than Northern Dynasty previously claimed.

### C. <u>Defendants Were Aware that Anglo American Believed that the Project would be Materially More Costly than the Company had Represented</u>

99. While Defendants publicly denied that Anglo American's departure from the Pebble Project resulted from concerns about the Project's viability, the evidence shows that during the Class Period, Defendants were aware that Anglo American believed that the Project would be significantly more costly than Defendants publicly represented.

100. The Kerrisdale Report detailed how the "***the likely upfront capital cost of the Pebble project would be roughly $11 to $13 billion – more than double the $4.7 billion figure used in the Northern Dynasty–commissioned 2011 preliminary assessment.***" *See* Section IV.C, *supra*. Kerrisdale also detailed how executives tied to Northern Dynasty actively sought to prevent those studies from being finalized or publicized. *Id.* According to Kerrisdale (and its confidential sources), the economic cost of developing and operating the Pebble Project was what drove away prior development partners and previously prompted Northern Dynasty to market its own interest for sale prior to the Class Period.

101. The Kerrisdale Report noted that the $13 billion cost estimate came from Anglo American, and that Anglo American felt that Northern Dynasty had also materially understated the likely operating costs. Kerrisdale quoted a former Anglo American engineer who noted that Anglo American believed costs were $13 billion,

while Northern Dynasty was saying costs were $4 billion, and that gap was too large to bridge. The engineer noted that this disagreement between Anglo American and Northern Dynasty led to constant fighting. *See* ¶¶51-52, *supra*.

102. In fact, Northern Dynasty's February 17, 2017 Rebuttal Report confirms that the Company knew that alternative cost estimates existed during the Class Period. Specifically, the Company described its own efforts to discredit the $13 billion study developed by Anglo American employees and stated, "Further, a review of a preliminary draft US$13 billion mine planning scenario by an independent engineering firm commissioned by Northern Dynasty identified issues with that study and identified savings that reduced the preliminary capital estimate by US$4 billion [i.e., to $9 billion]."

103. Defendants, however, did not disclose the existence of this figure to shareholders at any point during the Class Period. Instead, the only specific figure that Northern Dynasty disclosed, during the Class Period, was the $4.7 billion figure contained in the 2011 Preliminary Assessment. As such, Northern Dynasty was aware that an "independent engineering firm" that it commissioned estimated that project development costs were nearly double the $4.7 billion figure contained in the 2011 Preliminary Assessment, under the development scenario that gave rise to the $13 billion cost estimate reported in the Kerrisdale Report.

104. Thus, Anglo American was clearly at odds with Northern Dynasty about development costs as well as the Pebble Project's overall viability.

105. In addition, John Shivley ("Shivley"), the former CEO of the Pebble Partnership, explained, in a July 2012 FrontLine documentary titled "Alaska Gold," that "[i]t's a very complicated project. I mean, it's a mine, and it's a significant size mine. It's an 86-mile road. It's a brand-new port and it's a power plant."[18] In

---

[18] *Id.*

support of this proposition, Shivley remarked in passing that "It's going to be probably at least a $7 billion or $8 billion investment just to get us up and running." A single line concerning that estimate in an approximately 53-minute long documentary, primarily focused on Northern Dynasty's environmental impact, however, would not capture investors' attention. Shivley's statement was not mentioned in any SEC filings of press releases from the Company, it was not addressed direction in any of the Company's public statements, nor did it receive any press coverage. Defendants, however, repeatedly emphasized on the $4.7 billion figure in investor presentations.

### D. <u>During the Class Period, Defendants Used Northern Dynasty Stock as Currency</u>

106. Northern Dynasty's primary development project, the Pebble Project, did not generate any revenues during the Class Period. As disclosed in the Company's Form 20-F for the year ending December 31, 2015, filed with the SEC on May 2, 2016, "Northern Dynasty does not earn any revenues and has historically had, and will continue to have for the foreseeable future, negative cash flows. Historically, Northern Dynasty's sole source of funding has been provided by the sale of equity securities for cash, primarily through private placements." In addition, the Company disclosed that it would "need to raise additional financing to pursue any work programs at the Pebble Project and to meet its business objectives." This was especially true in the absence of development partners committed to funding the Pebble Project's operations, like Anglo American, which failed to materialize during the Class Period.

107. Secondary offerings are usually priced at a pre-negotiated price reflecting a slight discount to recent market prices.[19] This was true for each of Northern Dynasty's Class Period offerings.

108. More specifically, during the Class Period, Northern Dynasty executed a series of secondary offerings through which the Company used its own stock as currency to fund operations. The Company conducted the following offerings during the Class Period as described in its financial statements and news releases:

(i) On December 29, 2014, the Company announced that it initiated a private placement financing using special warrants that raised approximately $15.50 million. The special warrants were priced at C$0.431, which reflected a slight discount to the closing price of C$0.53 for TSX shares on the prior trading day, December 24, 2014.

(ii) On August 10, 2015, the Company announced that initiated a private placement financing using special warrants that would raise up to $20 million. The special warrants were priced at C$0.399, which reflected a slight discount to the closing price of C$0.45 for TSX shares on the prior trading day, August 10, 2015.

(iii) On December 23, 2015, the Company announced that it completed a private placement of common shares that raised approximately $5.18 million. The common shares were priced at C$0.412, which reflected a slight premium to the

---

[19] Kevin Pollack, *The Case for Registered Direct Offerings*, Seeking Alpha, *available at*: https://seekingalpha.com/article/188523-the-case-forregistered-direct-offerings (last visited June 16, 2018) ("RDOs typically involve a company selling registered stock to investors at a below market price"); *What Happens to the Share Price When New Shares Are Issued?*, The Motley Fool, *available at:* https://www.fool.com /knowledgecenter/what-happens-to-the-share-price-when-new-shares-ar.aspx (last visited June 16, 2018) ("To entice buyers to participate in the secondary offering, companies typically offer to sell their shares at a discount to the current market value.").

closing price of C$0.40 for TSX shares on the prior trading day, December 22, 2015.

(iv) On May 26, 2016, the Company announced that it planned to raise an additional $17.10 million through a prospectus financing consisting of an offering of common stock and warrants. The common shares were priced at C$0.45, which reflected the closing price of C$0.45 for TSX shares on the prior trading day, May 25, 2016.

(v) On July 5, 2016, the Company announced that it completed a private placement to raise an additional $2 million through an offering of common units, consisting of one share of common stock and one warrant (exercisable at $0.65).

(vi) On January 11, 2017, Northern Dynasty announced a secondary common stock offering. The Company subsequently upsized the size of the offering and raised over $49 million by the time the secondary offering closed on January 26, 2017. The offering was priced at USD $1.85, which reflected a slight discount to the closing price of US $1.88 for NYSE American shares on the prior trading day, January 4, 2017.

109. Because the prices of these newly offered securities were impacted by the trading price of Northern Dynasty stock at the time the offerings were announced, Defendants were motivated to maintain or inflate the price of Northern Dynasty stock during the Class Period as doing so would maximize the amount of money that they could be raised through the offerings. To ensure that investor demand and the share price of Northern Dynasty stock remained high after secondary offerings were announced, Defendants continually touted the potential of the Pebble Project.

110. For example, in a January 2017 investor presentation, Defendants stoked investor optimism by maintaining the ascendant Trump administration would ensure "a return to normal permitting" and unlock the prior investment in the Pebble

Project as commercially viable mine. During a January 23, 2017 investor conference, Thiessen specifically stated that the Trump administration had "a desire to permit Pebble."[20] This narrative enabled Northern Dynasty to successfully raise its largest Class Period secondary offering and at its highest share price. In drumming up investor demand, Defendants, however, still did not disclose the economic concerns which prompted Anglo American, its prior development partner, to walk away from its $541 million investment and take a $300 million write-down.

## X. CLASS ACTION ALLEGATIONS

111. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the common stock of Northern Dynasty during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

112. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Northern Dynasty stock was actively traded on the NYSE American. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Northern Dynasty shares were traded publicly during the Class Period on the NYSE American. As of December 31,

---

[20] N. Pearson, "Northern Dynasty Says It Has Trump Backing, Seeking New Partner," Bloomberg (Jan. 23, 2017), *available at*: https://www.bloomberg.com/news/articles/2017-01-23/northern-dynasty-says-it-has-trump-backing-seeking-new-partner.

2016, the Company had 270,869,561 shares outstanding. Record owners and other members of the Class may be identified from records maintained by Northern Dynasty or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113. Lead Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein. Further, Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

114. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' conduct alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Northern Dynasty, as well as the circumstances of Anglo American's departure from the Pebble Project; and

c. to what extent Class members have sustained damages and the proper measure of damages.

115. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

116. The market for Northern Dynasty securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's stock traded at artificially inflated prices during the Class Period. On February 10, 2017, the Company's stock closed at a Class Period high of $3.36 per share. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Northern Dynasty and the Pebble Project; Lead Plaintiffs and Class members have been damaged thereby.

117. During the Class Period, the artificial inflation of the value of Northern Dynasty securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Lead Plaintiffs and other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's securities to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's securities, causing Lead Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

118. At all relevant times, the market for Northern Dynasty stock was efficient for the following reasons, among others:

a. Northern Dynasty's stock met the requirements for listing, and it was listed and actively traded on the NYSE American, a highly efficient and automated market.

b. As a regulated issuer, Northern Dynasty filed periodic public reports with the SEC and/or the NYSE American.

c. Northern Dynasty regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

d. Northern Dynasty was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

119. Based on the foregoing, during the Class Period, the market for Northern Dynasty stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Northern Dynasty stock. Under these circumstances, the market for Northern Dynasty securities was efficient during the Class Period and, therefore, investors' purchases of Northern Dynasty stock at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

120. In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## XII. NO SAFE HARBOR

121. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory

safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made. In addition, as discussed above, *see* n.19, during the Class Period, Defendant Thiessen described risk disclosures as tantamount to statutorily-required boilerplate in connection with disclaiming the significance of risk warnings to the California Controller and New York City Comptroller.[21]

## XIII. <u>COUNTS</u>

### FIRST COUNT

### Violation of Section 10(b) of The Exchange Act and <u>Rule 10b-5 Promulgated Thereunder Against All Defendants</u>

122. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This claim is asserted against all Defendants.

---

[21] Notably, Defendant Thiessen adopted a similar view to required risk warnings in his letter to the California Controller and New York City Comptroller. He noted, "In reality, all publicly traded mining companies disclose similar risk factors" "in response to specific legal requirements" and went on to suggest that "there would be insufficient investment in production of the commodities necessary for a healthy modern society" if investors "were to avoid investing in mining and other resource companies" based on similar risk factors. *See* Letter from John Thiessen (CEO, Northern Dynasty) to John Chiang (Controller, State of California) and John Liu (Comptroller, New York City), dated Jan. 7, 2014, *available at*: https://www.eenews.net/assets/2014/02/10/document_pm_01.pdf. As suggested by the California Controller and New York City Comptroller's reliance on similar risk warnings, these disclosures were material to investors. But as indicated by Defendant Thiessen's own remarks, Northern Dynasty recognized that these legally required disclosures were no more than mere boilerplate disclosures.

123. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Northern Dynasty stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

124. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Northern Dynasty stock in violation of Section 10(b) of the Exchange Act and Rule 10b 5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

125. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Northern Dynasty's business, operations, management, and prospects, as specified herein.

126. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Northern Dynasty's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements about Northern Dynasty and its operations and financial results, in light

of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

127. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

128. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Northern Dynasty's business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations

and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

129. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Northern Dynasty was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Northern Dynasty stock during the Class Period at artificially high prices and were damaged thereby.

130. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Lead Plaintiffs were experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Northern Dynasty securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

131. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder.

132. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection

with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND COUNT**

**Violation of Section 20(a) of the Exchange Act**

**Against the Individual Defendants**

133. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

134. The Individual Defendants acted as controlling persons of Northern Dynasty within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

135. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

136. As set forth above, Northern Dynasty and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged

in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: June 18, 2018

GLANCY PRONGAY & MURRAY LLP

By: *<u>/s/ Lionel Z. Glancy</u>*
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Casey E. Sadler (#274241)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com

Ira M. Press (admitted *pro hac vice*)
Thomas W. Elrod (admitted *pro hac vice*)
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com

*Co-Lead Counsel for Lead Plaintiff NDM Investor Group and the Proposed Plaintiff Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On June 18, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 18, 2018, at Los Angeles, California.

*s/ Lionel Z. Glancy*

Lionel Z. Glancy

# Mailing Information for a Case 2:17-cv-01241-PSG-SS Victor Diaz v. Northern Dynasty Minerals Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas M Barba**
  tbarba@steptoe.com
- **Thomas W Elrod**
  telrod@kmllp.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **Philip S Khinda**
  pkhinda@steptoe.com,msherman@steptoe.com
- **Jason Levin**
  jlevin@steptoe.com,ehernand@steptoe.com
- **Adam C McCall**
  amccall@zlk.com
- **Patricia B Palacios**
  ppalacios@steptoe.com,mmurphy@steptoe.com
- **Ira M Press**
  ipress@kmllp.com,bmirza@kmllp.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com
- **Casey Edwards Sadler**
  csadler@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)